1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

JOANN LEDOUX,

9

               Plaintiff,

10

     v.

11

OUTLIERS, INC. (d/b/a THESIS, THESIS
NOOTROPICS, FIND MY FORMULA, and

12

FORMULA); DANIEL FREED; MATT
RUBIN; BRAND NUTRACEUTICALS,

13

INC. (d/b/a BRAND NUTRA); BRAND
PACKAGING GROUP, INC. (d/b/a BRAND

14

NUTRACEUTICALS); and John and Jane
Does 1-5.

15

               Defendants.

16

Case No. 3:24-cv-05808-TMC

ORDER DENYING MOTION TO COMPEL
ARBITRATION AND GRANTING IN
PART AND DENYING IN PART MOTION
TO DISMISS

17

## I.    INTRODUCTION

18

     Between March and September 2021, Plaintiff Joann LeDoux, a nurse in a military

19

hospital, purchased nootropic supplement kits from Defendant Outliers, Inc. (doing business as

20

Thesis or Thesis Nootropics). The company promised that the supplements supported cognitive

21

function, claiming that they were a natural alternative to stimulant-based medications like

22

Adderall. LeDoux alleges, however, that the products actually contained amphetamines, a class

23

of stimulants. When LeDoux was subject to a routine drug screening by the military, she tested

24

positive for amphetamines. She alleges that the Thesis supplements are the probable source.

Because of the positive drug screen, LeDoux was ultimately removed from her position. She lost access to her military benefits and both her mental and physical health deteriorated.

LeDoux sued Defendant Thesis, as well its corporate leadership, Defendants Daniel Freed and Matthew Rubin. Dkt. 1. She also sued the companies Thesis partnered with to manufacture and package the drug, Defendants Nutraceuticals and Brand Packaging Group. *Id.* LeDoux brings claims for 1) negligence; 2) unfair trade practices; 3) failure to warn; 4) design and manufacturing defect; 5) breach of warranty; and 6) misrepresentation and fraud. *Id.*

Defendants Thesis, Freed, and Rubin ("the Thesis Defendants") moved to compel arbitration. Dkt. 24. They argue that LeDoux agreed to arbitrate any claims against the company when she purchased the supplements. Because Defendants have not met their burden to show the existence of a valid agreement to arbitrate, the Court DENIES Defendant's motion without prejudice. Defendants may refile the motion to compel if they can provide sufficient evidence.

Defendants Nutraceuticals and Brand Packaging Group ("the Brand Nutra Defendants") moved to dismiss LeDoux's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. 32. They maintain that the complaint lacks sufficient detail to provide notice about the companies' potential liability.

The Court agrees as to LeDoux's second claim for unfair trade practices and her sixth claim for fraud and misrepresentation. Still, the Court concludes that LeDoux may remedy these deficiencies. Thus, the Court GRANTS the motion as to the unfair trade practices claim and the fraud and misrepresentation claim. LeDoux is granted leave to amend her complaint. The Court DENIES the motion as to LeDoux's other claims. If LeDoux chooses to amend her complaint, she must do so by March 11, 2025.

## II.    BACKGROUND

**A.    Factual Allegations**[1]

Joann LeDoux lived in Tacoma, Washington from June 2018 through March 2023. Dkt. 1 at 1, 17. LeDoux was an Army Nurse, specifically a Certified Registered Nurse Anesthetist, at Joint Base Lewis-McChord. *Id.* at 17. LeDoux worked "long" hours and sometimes "struggled with concentrating, remaining focused, alert, and awake during and after surgery." *Id.* While dealing with these challenges at work, LeDoux saw several advertisements from the Thesis Defendants on social media. *See id.* at 17–18. The advertisements were for Thesis's promotion of its Formula Nootropic Supplements. *Id.* at 18.

Defendant Daniel Freed is Thesis's co-founder and Chief Executive Officer. *Id.* at 2. Thesis sells nootropics: "a subset of drugs . . . presented as pharmaceuticals or supplements for the improvement of cognitive functioning and the support of brain health." *Id.* at 4, 8. While some nootropics are "verified as safe for human consumption in the form of FDA-approved drugs," others "are offered as over-the-counter dietary supplements and are not regulated the same way as FDA-approved drugs." *Id.* at 4. The Thesis supplements fall into the latter category. *Id.* at 8. Per their website, Thesis's supplements are a "class of compounds that enhance cognitive function by helping to promote neurotransmitter activity to support motivation, mood, memory, and focus." *Id.* The Thesis Defendants "market and sell their products as unique nootropic blends designed to cater to different cognitive goals, including but not limited to improving productivity and maintaining mental sharpness and working memory." *Id.*

---

[1] "In reviewing motions to compel arbitration . . . a court must consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Herrera v. Cathay Pacific Airways Limited*, 94 F.4th 1083, 1085 (9th Cir. 2024) (internal quotation marks omitted). The Court assumes the allegations in the complaint to be true. *Id.*

LeDoux filled out a quiz on Thesis's website intended to "generate a specific collection of their products that they characterize as personalized for her needs, and the desired cognitive improvements." *Id.* at 18. Upon completion of the quiz, LeDoux paid for the first month of a monthly subscription containing four packs of different Formula Nootropic Supplements. *Id.* She purchased the supplements eight times. *Id.* LeDoux began the subscription around March 18, 2021 and canceled her monthly subscription in late September or early October 2021. *Id.*

LeDoux began taking the supplements in March 2021. *Id.* at 19. As part of her role at the Army Medical Center on Joint Base Lewis-McChord, LeDoux was subject to regular drug screenings for controlled substances consumed without a valid and current prescription. *Id.* at 20. In compliance with this policy, LeDoux submitted a urine sample on August 16, 2021. *Id.* LeDoux's drug screen tested positive for the presence of amphetamines. *Id.*

The military began an investigation into LeDoux's drug screen results. *See id.* at 21. As LeDoux lays out in her complaint, "[w]hen a service member tests positive on a military urinalysis for a substance that is not facially illicit and for which a member could be authorized to take based on a prescription, the Army appoints what is known as a Medical Review Officer ('MRO')." *Id.* The MRO asks about prescriptions not included in military records. *Id.* LeDoux provided a list of over-the-counter substances she was taking then, but, not having a prescription for amphetamines, could not explain the cause of her positive result. *See id.* at 22. LeDoux "initially suspected" that Sudafed may be the cause. *Id.* She later came to believe that the Formula Nootropic Supplement was the "likely source of her positive Amphetamine result." *Id.* The MRO "annotated that Thesis' products may belong to 'a class of supplements that may contain amphetamines.'" *Id.*

Because LeDoux could not furnish a prescription for amphetamines, she was subject to a military criminal trial. *Id.* at 22–23. She alleges that, as part of that trial, Defendant Mark Rubin,

the head of supply chain for Defendant Thesis, provided "false order history records" denying that LeDoux received all of the ordered products. *Id.* at 23. Upon producing order numbers to Rubin, the company produced "accurate order history." *Id.* During the trial, Defendant Freed declined to answer questions about the source of the supplements' ingredients, the manufacturing process, and testing of the ingredients/supplements. *Id.*

Ultimately, LeDoux lost her eligibility for a promotion from Major to Lieutenant Colonel, was "administratively flagged," and "made to leave the military before the expiration of her mandatory retirement date." *Id.* at 24. Consequently, LeDoux is "suffering the loss of a full pension from the US Military," and is "losing millions in bonuses, pay, . . . and other military benefits." *Id.* She was forced to participate in an "Impaired Provider Program" at the military hospital where she worked and directed to attend the Army Substance Abuse Program. *Id.* at 26. She had her security clearance revoked. *Id.* She fears that her state license to work as a Certified Registered Nurse Anesthetist will be revoked. *Id.* And LeDoux was "titled and indexed in the National Crime Information Center (NCIC) database following the military law enforcement probable cause decision for wrongful use of a controlled substance." *Id.* at 25.

Upon discontinuing the supplements, LeDoux alleges she "suffered physiological withdrawal effects[,]" such as "depression combined with cravings and dependency symptoms, including that she was unable to stay awake, alert, or mentally present, despite ingesting copious amounts of caffeine." *Id.* at 24. LeDoux was diagnosed with severe clinical depression and suicidal ideation, and still has post-traumatic stress disorder. *Id.* Because of her custody arrangement, which requires she continue her military service, she may be forced to relinquish custody of her children. *Id.* at 25.

On September 25, 2024, LeDoux sued Defendant Outliers, Inc., (doing business as Thesis, Thesis Nootropics, Find My Formula, and Formula), as well as Thesis's CEO Daniel

Freed and Director of Supply Chain Matthew Rubin. *Id.* at 1–2. LeDoux also sued the Brand

Nutra Defendants, alleging that they "assist with the manufacture and packaging" of the Thesis

nootropic supplements. *Id.* at 10. These Defendants include Brand Nutraceuticals, Inc. and Brand

Packaging Group, Inc. *Id.* at 2. And LeDoux named "John and Jane Does 1-5" as "persons who

names and addresses are unknown, but who directly and/or personally participated in the tortious

acts and omissions in the design, manufacture, packaging, distribution, and sale of the Formula

product at issue." *Id.*

　　LeDoux alleges that the product contained amphetamines, despite claiming to be an

alternative to traditional amphetamine-based medications (i.e., Adderall). *Id.* at 19. She alleges

that the Thesis Formula Nootropic Supplement is "(a) wrongfully distributed, marketed, and sold

for human consumption without the required premarket verification of safety; (b) contained

ingredients and drugs obtained from outside the U.S.; (c) contained pharmaceuticals; and (d)

caused dependence, addiction, and withdrawal in regular users." *Id.* at 27. LeDoux cites to

studies of other nootropic-selling companies' products that found that the products contained

undisclosed drugs, including amphetamines. *Id.* at 7, 11. She also includes a letter sent by the

Food and Drug Administration (FDA) to Defendant Brand Group Packaging. *Id.* at 7; Dkt. 1-2.

The letter was sent following an inspection of the facilities that "revealed significant violations"

of the FDA's requirements for manufacturing, packaging, labeling, and holding dietary

supplements. Dkt. 1-2 at 1. And she provides information from batch record reviews that she

alleges show that the product contained other unauthorized ingredients. Dkt. 1 at 14–15.

　　LeDoux brings claims for negligence; unfair trade practices; failure to warn; design and

manufacturing defect; breach of warranty; and misrepresentation and fraud. *Id.* at 28–36. The

claims are brought against all Defendants. *Id.* In response, on November 27, 2024, the Brand

Nutra Defendants moved to dismiss LeDoux's complaint for failure to state a claim. Dkt. 24. The

Brand Nutra Defendants primarily argued that LeDoux's complaint operates at too general a level—repeatedly grouping the Defendants together without distinguishing their activity. *See generally id.* Plaintiff responded on November 18, 2024. Dkt 30.

**B.    The Alleged Arbitration Agreement**

On November 13, 2024, the Thesis Defendants moved to compel arbitration. Dkt. 14. The Thesis Defendants maintain that to make a purchase on their website, a consumer must consent to Thesis's Terms and Conditions. Dkt. 15 at 3. The Terms and Conditions state, in relevant part:

> DISPUTE RESOLUTION AND CHOICE OF LAW
>
> Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules. The arbitration hearing shall take place in the Southern District of New York, before a single arbitrator. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.
>
> Further, you agree that any issue or dispute arising out of or in connection with your use of our site, intellectual property, the Terms, or any matter concerning Company shall be governed by the laws of the United States and the State of New York with venue in the Southern District of New York.

*Id.* at 3–4. Defendants also point to the company's acceptance provision:

> ACCEPTANCE OF TERMS AND CONDITIONS
>
> By making any use of our Websites ("Website" or "sites"), Services, and any purchase from us, you expressly agree to the terms contained herein. You consent and agree that your use of a keypad, mouse or other device to select an item, button, icon, checkbox, to enter text, or to perform a similar act/action, while using our sites, for the purpose of accessing or making any transactions regarding any agreement, acknowledgement, consent, terms, disclosure, or conditions, constitutes your signature, including without limitation of the United States Electronic Signatures in Global and National Commerce Act, P.L. 106-229 . . . as if actually signed by you in writing.

*Id.* at 4.

The Thesis Defendants maintain that, in purchasing supplements from their website, LeDoux agreed to these Terms and Conditions. Dkt. 14 at 9. Thus, they argue, LeDoux's claims

"require mandatory arbitration before an arbitrator in the Southern District of New York." *Id.*
Defendants urge the Court to grant their motion to compel arbitration and stay or dismiss the
case. *Id.* They also ask the Court to transfer or dismiss the case because venue is improper. *Id.*

Both the motion to compel arbitration, Dkt. 14, and the motion to dismiss, Dkt. 24, are
ripe for the Court's consideration. The Court has reviewed the briefing for each of these motions.

### III.    LEGAL STANDARD

**A.    Jurisdiction and Applicable Law**

Before addressing each motion's merits, the Court must confirm that it has subject matter
jurisdiction over the parties' claims. *See United Invs. Life Ins. Co. v. Waddell & Reed Inc.*, 360
F.3d 960, 966–67 (9th Cir. 2004) ("[A] district court's duty to establish subject matter
jurisdiction is not contingent upon the parties' arguments. . . ." and it generally has an obligation
to establish subject matter jurisdiction "*sua sponte*, whether the parties raised the issue or not").

"[T]he burden of establishing [jurisdiction] rests upon the party asserting jurisdiction."
*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). LeDoux alleges in her
complaint that the Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2). Dkt. 1 ¶ 11.

The Court has diversity jurisdiction over this action because the amount in controversy
exceeds $75,000 and the opposing parties are citizens of different states. LeDoux is a California
resident, thought the alleged events all occurred in Washington, and the Defendants are residents
and/or incorporated in Delaware and New York. *Id.* ¶¶ 11–12. LeDoux asks for general and
special damages, punitive damages, injunctive relief, and attorney's fees. *Id.* at 36–37.

"When a plaintiff invokes federal-court jurisdiction, the plaintiff's amount-in-controversy
allegation is accepted if made in good faith." *Dart Cherokee Basin Operating Co., LLC v.
Owens*, 574 U.S. 81, 87 (2014) (citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 276
(1977)). The amount in controversy depends on the value of claims both for monetary damages

and equitable relief. *In re Ford Motor Co./Citibank (S.D.), N.A.*, 264 F.3d 952, 958–59 (9th Cir. 2001). Potential punitive damages are also part of the amount in controversy. *Gibson v. Chrysler Corp.*, 261 F.3d 927, 946 (9th Cir. 2001).

LeDoux's complaint is vague, requesting damages "in an amount to be proven at trial," along with punitive damages and attorney's fees under the relevant Washington statutes. Dkt. 1 at 36–37. But the "vagueness of [LeDoux's] pleadings . . . should not preclude this Court from noting that these damages are potentially substantial." *Richmond v. Allstate Ins. Co.*, 897 F. Supp. 447, 450 (S.D. Cal. 1995). LeDoux claims that, as a result of the Defendants' actions, she has suffered the "loss of a full pension from the US Military" and the loss of "millions in bonuses, pay, ordinary pension, and other military benefits." Dkt. 1 ¶¶ 46–47. LeDoux's complaint could certainly be clearer, but, it nevertheless sufficiently alleges diversity jurisdiction.

**B.     Motion to Compel Arbitration**

The Federal Arbitration Act ("FAA") makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "A party seeking to compel arbitration has the burden under the FAA to show (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue." *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). While there is an "emphatic federal policy in favor of arbitral dispute resolution," *KPMG v. Cocchi*, 565 U.S. 18, 21 (2011), the Court must make the threshold determination that a valid contract was formed before ordering arbitration, *see Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999); *Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213, 1217 (9th Cir. 2008). Courts apply state contract law to determine whether the parties

formed a valid agreement to arbitrate. *Lowden*, 512 F.3d at 1217 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

Thus, as explained below, the Court would be required here to apply either New York or Washington state law. In Washington, "[a]rbitration agreements stand on equal footing with other contracts." *Burnett v. Pagliacci Pizza, Inc.*, 196 Wash.2d 38, 47, 470 P.3d 486 (2020). And "mutual assent is required for the formation of a valid contract. It is essential to the formation of a contract that the parties manifest to each other their mutual assent to the same bargain at the same time." *Id.* at 48 (cleaned up). The same is true in New York. *See, e.g.*, *Bennett v. T-Mobile USA, Inc.*, No. 2:22-CV-01805-LK, 2024 WL 229580, at *6 (W.D. Wash. Jan. 22, 2024) (citation omitted) ("[T]he Court finds that there is no actual conflict between New York and Washington law regarding the formation of a contract[.]").

"This rule applies to the formation of an arbitration agreement just as it does to the formation of any other contract." *Id.* "The first principle that underscores all of our arbitration decisions is that arbitration is strictly a matter of consent," *id.* (quoting *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019)), and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* at 48 (quoting *Satomi Owners Ass'n v. Satoma, LLC*, 167 Wash.2d 781, 810, 225 P.3d 213 (2009)).

## C.    Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) motions may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citation

omitted). To survive a Rule 12(b)(6) motion, the complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

The Court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party," *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014), but need not "accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Finally, in a case alleging the same claims against multiple defendants, there must be specific allegations explaining what each defendant allegedly did wrong, rather than general allegations asserted against them as a group. *Trusov v. Oregon Health & Sci. Univ.*, No. 3:23-CV-77-SI, 2023 WL 6147251, at *2 (D. Or. Sept. 20, 2023); *see Evans v. Sherman*, 2020 WL 1923176, at *3 (E.D. Cal. Apr. 21, 2020) (noting that a plaintiff who "simply lumps all defendants together" makes it "impossible for the Court to draw the necessary connection between the actions or omissions" of the various defendants); *In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 908 (N.D. Cal. 2018) ("Plaintiffs must identify what action each Defendant

took that caused Plaintiffs' harm, without resort to generalized allegations against Defendants as a whole." (internal quotation marks and citation omitted)); *Wright v. City of Santa Cruz*, No. 13–cv–01230–BLF, 2014 WL 5830318, at *5 (N.D. Cal. Nov. 10, 2014) ("These allegations are inadequate because they lump all defendants together and fail to allege the factual basis for each defendant's liability.").

## IV.    DISCUSSION – MOTION TO COMPEL ARBITRATION

### A.    Formation of Online Contracts

In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Both Washington and New York law require mutual assent for contract formation. *Donna Reed, individually & on behalf of all others similarly situated, Plaintiff, v. Sci. Games Corp.*, *Defendant.*, No. C18-0565RSL, 2021 WL 2473930, at *2 (W.D. Wash. June 17, 2021) (quoting *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 177, 94 P.3d 945 (2004)) ("[F]or a contract to form, the parties must objectively manifest their mutual assent.'"); *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002)) ("'[M]utual manifestation of assent' remains a touchstone of contract formation."). This is no different for a virtual contract. *See Berman*, 30 F.4th at 855–56. Consequently, "if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Id.* at 856.

But mutual assent in an online forum is not always readily apparent. *See id.* Thus, "[t]o avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements such as those at issue here have devised rules to

determine whether meaningful assent has been given." *Id.* These courts have designated two

types of online agreements: clickwrap and browsewrap. *See, e.g., id.*; *see also Oberstein v. Live*

*Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023) (describing both types of agreements).

Clickwrap agreements typically require checking a box or clicking a button labeled as an

agreement to the terms. *Berman*, 30 F.4th at 856 ("The most straightforward application of these

principles in the online world involves so-called 'clickwrap' agreements, in which a website

presents users with specified contractual terms on a pop-up screen and users must check a box

explicitly stating 'I agree' in order to proceed."). When a consumer signifies their assent by

clicking a box or button, "the consumer has received notice of the terms being offered and . . .

'knows or has reason to know that the other party may infer from his conduct that he assents' to

those terms." *Id.* (quoting Rst 2d of Contracts § 19(2)). Courts often enforce clickwrap

agreements because they provide "conspicuous" notice and require clear assent. *See id.*

On the other hand, browsewrap agreements are harder to enforce because they typically

rely on passive user behavior, such as continued use of a website, as assent to contractual terms.

*Id.* (citing *Nguyen v. Barnes & Noble*, 763 F.3d 1171, 1176 (9th Cir. 2014) ("At the other end of

the spectrum are so-called 'browsewrap' agreements, in which a website offers terms that are

disclosed only through a hyperlink and the user supposedly manifests assent to those terms

simply by continuing to use the website.")). Courts are often "more reluctant to enforce

browsewrap agreements because consumers are frequently left unaware that contractual terms

were even offered, much less that continued use of the website will be deemed to manifest

acceptance of those terms." *Id.* (citing *Nguyen*, 763 F.3d at 1178).

Of course, many websites' designs do not fall neatly into these categories. For example,

courts have also recognized a subspecies of agreement deemed "modified clickwrap." *See, e.g.*,

*Rocha v. Urb. Outfitters, Inc.*, No. C23-542, 2024 WL 393486, at *3 (N.D. Cal. Feb. 1, 2024);

*Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019); *see also Nguyen*, 763 F.3d at 1176–77. "These contracts exist where a signup screen states that acceptance of a separate agreement is required before the user can access the service." *Rocha*, 2024 WL 393486, at *3 (cleaned up). "Courts are 'more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement . . . [and] the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound.'" *Id.* (quoting *Nguyen*, 763 F.3d at 1177).

Courts have also crafted some parameters to use in assessing whether a user knew, or should have known, that they were assenting to a site's terms. *See, e.g.*, *Berman*, 30 F.4th at 857–58; *Oberstein*, 60 F.4th at 516–17. Courts consider how obvious the text is, whether it is hard to read, the color of the font, underscoring, or "other unambiguous design elements to signal that a link exists." *Vargison v. Paula's Choice, LLC, et al.*, No. 2:24-cv-00342-TL, 2025 WL 346197 (W.D. Wash. Jan. 30, 2025); *see also Grant v. T-Mobile USA, Inc.*, No. 2:23-CV-01946-MJP, 2024 WL 3510937, at *4 (W.D. Wash. July 23, 2024). For example, in *Grant v. T-Mobile*, the court found that by clicking an "Accept your award" button, the plaintiff manifested her assent to the terms. The button was immediately below text stating: "'By clicking 'Accept my award', I confirm that I have opened, read, understand, and <u>agree</u> to the documents[.]'" 2024 WL 3510937, at *5 (emphasis in original). The Court noted the "acceptance screen is uncluttered, the hyperlink to the Agreement is underlined and separated from other text by ample white space, and, importantly, is labeled with '(PDF)' next to the name of the document." *Id.* at *4.

To parse these differences, and to avoid "the unfairness of enforcing contractual terms that consumers never intended to accept," the Ninth Circuit has "devised rules to determine whether meaningful assent has been given." *See Berman*, 30 F.4th at 856. "Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable

contract will be found based on an inquiry notice theory only if: (1) the website provides

reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the

consumer takes some action, such as clicking a button or checking a box, that unambiguously

manifests his or her assent to those terms." *Id.* (first citing *Meyer v. Uber Techs., Inc.*, 868 F.3d

66, 75 (2d Cir. 2017); and then citing *Nguyen*, 763 F.3d at 1173); *see also Oberstein*, 60 F.4th at

514 ("The *Berman* court employed a materially indistinguishable two-part test that is used by

both California and New York courts, which requires (1) reasonably conspicuous notice and (2)

an unambiguous manifestation of assent.").

**B.    Factual Gaps in the Parties' Briefing**

Here, the Thesis Defendants have moved to compel arbitration on the grounds that, when

LeDoux purchased supplements from their website, she assented to the company's Terms and

Conditions. Dkt. 14 at 2. Those Terms and Conditions include a clause requiring any disputes

"take place in the Southern District of New York, before a single arbitrator." *Id.*; Dkt. 15 at 3.

LeDoux disagrees. Dkt. 26. She argues that she was not ever made aware of any terms of

service, and thus could not have agreed to "any such terms." *Id.* at 5. She maintains that "the

purported terms were all but hidden." *Id.* at 7. The terms "were buried at the bottom of a long

webpage, and there was no readily discernible hyperlink and no affirmative step that would have

put" her on notice that the terms existed. *Id.* at 7–8.

Defendants bear the burden of proving that LeDoux assented to their Terms and

Conditions. The party seeking to compel arbitration "bears 'the burden of proving the existence

of an agreement to arbitrate by a preponderance of the evidence.'" *Norcia v. Samsung Telecomm.

Am.*, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting *Knutson v. Sirius XM Radio Inc.*, 771 F.3d

559, 565 (9th Cir. 2014)). "This burden is substantial and the Court must give the party denying

the existence of an agreement 'the benefit of all reasonable doubts and inferences that may

arise.'" *Saeedy v. Microsoft Corp.,* No. C24-0219-SKV, 2024 WL 4945106, at *5 (W.D. Wash. Nov. 21, 2024) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)); *see also Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (a "presumption in favor of arbitrability" applies only where the scope of an agreement to arbitrate is ambiguous: "If the parties contest the *existence* of an arbitration agreement, the presumption in favor of arbitrability does not apply.") (emphasis in original).

To assist in the Court's inquiry, a defendant typically submits a screenshot of the way it maintains a user agreed to terms, allowing for evaluation of factors "such as the size of the text, the color of the text as compared to the background, the location of the text, the obviousness of the hyperlink, and whether other elements on the screen clutter or otherwise obscure the textual notice." *Robbins v. Mscripts, LLC*, C23-1381, 2023 WL 5723220, at *5 (N.D. Cal. Sept. 5, 2023). Alternatively, the defendant may provide a "sufficiently detailed declaration describing the account creation process, from an individual with knowledge of that process." *Saeedy,* 2024 WL 4945106, at *9 (quoting *Robbins*, 2023 WL 5723220, at *5).

As noted above, LeDoux alleges that she never assented to Defendant Outliers' Terms and Conditions. *See, e.g.*, Dkt. 26 at 7–8. She alleges that there was no pop up, click box, or checkbox. *Id.* at 3 ("There was no pop-up for her to check 'I agree' to any terms of use or purchase agreement; there was no mandatory scrolling to ensure she had an opportunity to view their terms; there were no terms that she ever saw."). She claims only that there was a link at the bottom of the site page. *Id.* at 4. The briefing explains, "[f]rom the available data for the 'Find My Formula' website in October 2021, at the very bottom of the web page, . . . in the lower right-hand corner, there are blue letters entitled 'terms of use.'" *Id.* at 4. "It was not readily apparent to a user who finds the 'terms of use' that it contains a hyperlink that a user could click on." *Id.* LeDoux also offers an affidavit, in which she states that she never saw the terms and that

"at no time did I even see any terms of use or purchase agreement on the webpage. At no time did I see any terms when I made my purchase." Dkt. 27 at 10.

LeDoux offers both screenshots and a video attachment. Dkt. 27 at 12, 14, 18, 20. The video attachment is obtained through a tool known as the WayBack Machine ("Wayback"). *Id.* at 14. Wayback "enables us to look back to available historical snapshots of webages." *Id.* It is limited in that it can "obtain only a record of what was historically captured and cached in the system." *Id.* The video attachment shows the website homepage as it would have appeared in 2021. *Id.* The video confirms that the Terms and Conditions were located at the bottom of the page and were not underscored to show that they were a link. *See id.* Critically, the video does not show what the checkout page looked like. Nor do any of the other attachments to the plaintiff attorney's declaration. *See generally* Dkt. 27.

The checkout page is at the center of this dispute. The Thesis Defendants argue that LeDoux checked a box to complete her purchase. Dkt. 15 at 2–3. Defendants' declaration explains that the app they use for checkout, CartHook, has a "checkbox conspicuously placed directly above the checkout button that stated something to the effect of 'I have read and agree to the Terms and Conditions and Medical Disclaimer.'" *Id.* at 2. Defendants also allege that "[b]oth the Terms and Conditions and the Medical disclaimer were linked. It was not possible to purchase the product if the checkbox was not checked[.]" *Id.* at 2–3. Defendants do not provide any screenshots or other evidence that this was the case. *See generally* Dkt. 15. The screenshots of the website attached to their motion do not show the checkout screen. *See id.*

Attached to their reply, the Thesis Defendants provide an affidavit from the former Chief Technology Officer of CartHook, the software used by the Thesis Defendants to create their checkout page. Dkt. 29-1. The affidavit explains that "affiant oversaw the design and development of the one-page checkout and the integration with subscription services that

allowed consumers to purchase subscriptions on the CartHook checkout." *Id.* at 3. The CartHook officer attests that "on the one-page checkout for a subscription product, directly above the complete purchase button was a check box that stated a user is agreeing to purchase a subscription and agreeing to the company's Terms and Conditions." *Id.* "If the box was not checked you would not be able to complete the subscription purchase." *Id.* The affidavit also explains that in 2021, "the default configuration of the one page checkout contained a checkbox above the 'buy button' and that and in order to purchase products, a customer must have the checkbox ticked off, to accept the 'Terms and Conditions.'" *Id.* The affidavit acknowledges, however, that a brand could change the default configuration to remove the checkbox. *Id.*

To the extent that this affidavit offers new evidence, the Court gives it little weight. The district court need not consider arguments raised for the first time in a reply brief. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003)); *see also Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996) (citing *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir.1990)) ("Issues raised for the first time in the reply brief are waived."); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond.") (alteration in original) (citation omitted); *SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 889 (N.D. Cal. 2017) (overruling objection to new evidence submitted in reply when the court provided the opposing party "an opportunity to file a supplemental submission responding").

The Thesis Defendants have offered little else. Attached to their original motion are several exhibits, but none show that it is more likely than not that LeDoux clicked a box, assenting to the terms and conditions. *See* Dkt. 15-1 (Terms and Conditions); Dkt. 15-2 (Medical Disclaimer); Dkt. 15-3 (email and ordering information for LeDoux).

Further, the Thesis Defendants have given the Court reason to question the reliability of their evidence. In Defendant Freed's affidavit, he states, "the attached Exhibit 'A' is kept in the ordinary course of business by affiant, of the business record custodian, and kept in the file, without alteration of JOANN LEDOUX from March 18, 2021 through present." Dkt. 15 at 3. The statement continues, "This Exhibit was made at or near the time MS. LEDOUX contracted with Find My Formula, n/k/a OUTLIERS INC., d/b/a THESIS on March 18, 2021, it was the regular practice of Find My Formula . . . to record the information set forth in the attached Exhibits 'A', 'B' and 'C', affiant is familiar with the records and the circumstances under which they were made and the record(s) have been kept in a safe place, to wit: in the JOANN LEDOUX customer, consumer file through present." *Id.*

But a review of Exhibit A makes clear that the Thesis Defendants' claims about the company's records are not true. Dkt. 15-1 at 2. The top and bottom of the page, which allegedly shows Defendants' Terms and Conditions on the website as they were in March 2021, are labeled with the WayBack URL. *Id.* This is obvious on every page of the report:



*Id.* at 2–3. The same is true of Exhibit B, the Medical Disclaimer allegedly on Defendants' website at the time of LeDoux's purchase. Dkt. 15-2. Accordingly, the Court is reluctant to rely solely on attestations made in Defendants' affidavits to decide this motion. And right now, these attestations are all the Court has.

ORDER DENYING MOTION TO COMPEL ARBITRATION AND GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS - 19

Determining whether LeDoux checked a box at checkout assenting to the Terms and Conditions is essential to this motion. Were there a box to click at checkout, that would satisfy the requirements for a clickwrap agreement. *See, e.g.*, *Berman*, 30 F.4th at 856. A contract would be formed, and, without any contract formation defenses, LeDoux would have to arbitrate. *See id.* On the other hand, if there was not a box, the agreement is mere browsewrap. *See, e.g.*, *Nguyen*, 763 F.3d at 1176. In that scenario, no contract would be formed, and LeDoux could proceed with litigation in this Court. *See id.*

The Thesis Defendants bear the burden of proving the existence of an agreement by a preponderance of the evidence. *Norcia*, 845 F.3d at 1283. Thus, Defendants must show that it is more likely than not that LeDoux clicked a box at checkout. *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) (explaining that a preponderance of the evidence means "it is 'more likely than not' that the amount in controversy exceeds" the jurisdictional threshold); *Evitt v. Wells Fargo Bank, N.A.*, No. CV24-5734 BHS, 2024 WL 4678269, at *2 (W.D. Wash. Nov. 5, 2024)  (cleaned up) (discussing in determining the amount in controversy for an arbitration award that the "defendant bears the burden of proving by a preponderance of the evidence that the jurisdictional amount is met" and "[t]his means the defendant 'must provide evidence establishing that it is more likely than not that the amount in controversy exceeds that amount.'") (cleaned up); *Brickan v. Fed. Sav. Bank*, No. SACV 22-01053-CJC(KESX), 2024 WL 3005921, at *3 (C.D. Cal. May 10, 2024) ("Defendant provided considerable evidence . . . that establishes that it is more likely than not that it must have been Plaintiff who signed the most recent employment agreement without opting out of arbitration").

Because of the deficiencies in Defendants' motion, Defendants have not met this burden. For these reasons, the Court DENIES the motion to compel arbitration without prejudice. The

Thesis Defendants may reraise the argument with additional evidence, if they have it, at a later date.[2]

## V.    DISCUSSION – MOTION TO DISMISS

As laid out above, under Rule 8, courts "assume the veracity of a complaint's factual allegations and then determine whether they plausibly give rise to an entitlement to relief." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, (9th Cir. 2016) (citations omitted). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1179–80. When a plaintiff fails to do so, the claim should be dismissed. *Twombly*, 550 U.S. at 555.

The Brand Nutra Defendants have moved to dismiss each of LeDoux's claims: 1) negligence; 2) unfair trade practices; 3) failure to warn; 4) design and manufacturing defect; 5) breach of warranty; and 6) misrepresentation and fraud. *See* Dkt. 1 at 28–36. These claims are brought under the relevant Washington statutes. *Id.* For purposes of this motion, Defendants presume LeDoux properly filed the case in this Court. Dkt. 24 at 5. Thus, rather than analyzing the claims under both New York and Washington law, the Court applies only Washington law.

### A.    Negligence

Brand Nutra Defendants first ask that LeDoux's negligence claim be dismissed. Dkt. 24 at 5. LeDoux alleges that the Thesis and Brand Nutra Defendants "were all negligent and careless in the sourcing, import, design, testing, manufacture, labeling, marketing, distribution and/or sale of Formula Nootropic Supplement products." Dkt. 1 at 28. The "allegations amount to a products liability claim" under the Washington Products Liability Act (WPLA). *Huntington*

---

[2] The Court also declines to reach the arguments made by both parties about the proper forum, applicable state law, conscionability of the agreement, and equitable estoppel. These each require that LeDoux assented to Defendants' Terms and Conditions. Because the Court cannot find that LeDoux did so, the Court need not address these claims.

1   *v. Smoke City for Less LLC*, No. 4:22-CV-05014-MKD, 2023 WL 2031423, at *3–4 (E.D. Wash.

2   Jan. 11, 2023) (citing RCW 7.72.010(4)). LeDoux "does not need to cite the statute" to bring a

3   products liability claim under it. *Id.* (quoting *Kaspers v. Howmedica Osteonics Corp.*, No. C15-

4   0053JLR, 2015 WL 12085853, at *6 (W.D. Wash. Oct. 23, 2015)).

5        The WPLA "created a single cause of action for product-related harms and supplants

6   previously existing common law remedies, including common law actions for negligence." *Staub*

7   *v. Zimmer, Inc.*, No. C17-0508JLR, 2017 WL 2506166, at *2 (W.D. Wash. June 9, 2017)

8   (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 858 P.2d 1054, 1067 (Wash.

9   1993)). The WPLA subjects a manufacturer "to liability to a claimant if the claimant's harm was

10  proximately caused by the negligence of the manufacturer in that the product was not reasonably

11  safe as designed or not reasonably safe because adequate warnings or instructions were not

12  provided." RCW 7.72.030(1).

13       The WPLA describes "several types of manufacturer liability and offers elements to

14  support such claims." *Huntington*, 2023 WL 2031423, at *3 (citing RCW 7.72.030). "Thus, to

15  state a claim under the WPLA, a plaintiff must plead non-conclusory allegations that plausibly

16  support (1) a defective design claim; (2) a failure to warn claim; (3) a defective manufacture

17  claim; or (4) a breach of express or implied warranty claim." *Staub*, 2017 WL 2506166, at *2

18  (citations omitted). Alternatively, under the statute, a plaintiff can plead a theory of strict

19  liability. RCW 7.72.030(2). But a plaintiff need not commit to a specific theory of liability

20  before discovery. *Olympic Air, Inc. v. Helicopter Tech. Co.*, No. C17-1257RSL, 2020 WL

21  6381810, at *2 (W.D. Wash. Oct. 30, 2020) (citing *Braden v. Tornier, Inc.*, No. C09-5529RJB,

22  2009 WL 3188075, at *3 (W.D. Wash. Sept. 30, 2009)). "Requiring plaintiffs to plead facts in

23  support of a specific theory under the WPLA would 'shut the courthouse doors before plaintiffs

24

had an opportunity to meaningfully engage in the process.'" *Id.* (quoting *Frisvold v. Pentair Filtration Sols. LLC*, C17-136RSL, 2017 WL 3236972, at *2 (W.D. Wash. July 31, 2017)).

To state a claim under the WPLA, "a complaint must allege factual matter to fit into a prescribed category of manufacturer liability." *Huntington*, 2023 WL 2031423, at *3. To bring a claim of negligence, a plaintiff must show (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) that the breach was the proximate cause of that injury. *Innovative Sols. Int'l, Inc. v. Houlihan Trading Co.*, No. C22-0296-JCC, 2022 WL 10419055, at *3 (W.D. Wash. Oct. 18, 2022).

LeDoux alleges that the Brand Nutra Defendants owed her a duty of reasonable care and breached that duty by 1) carelessly sourcing, importing, designing, testing, manufacturing, labeling, marketing, and distributing the Formula Nootropic Supplements; 2) failing to inspect and test the supplements before sending them to the Thesis Defendants for sale; and 3) failing to disclose the risks of adulteration of the supplements. *See* Dkt. 1 at 28. LeDoux alleges that the Defendants violated industry and regulatory standards and should have known that the supplements "were developed in a way that presented an unreasonable risk of adulteration and were unreasonably dangerous and injurious to individuals who were never warned of the various unsafe ingredients and adulterants they contained." *Id.* LeDoux also claims that Defendants' "failures to discharge their duties were a direct and proximate cause of Plaintiff's . . . including the amphetamine poisoning that adversely affected JOANNE LEDOUX, triggering the positive drug test." *Id.* LeDoux has sufficiently pled a negligence theory of liability against the Brand Nutra Defendants. *See Huntington*, 2023 WL 2031423, at *4 (similar).

The Brand Nutra Defendants, however, argue that the claim "does not clarify or distinguish between the alleged duties owed by the 'THESIS DEFENDANTS,' 'BRAND NUTRA DEFENDANTS,' and/or the 'BRAND DEFENDANTS,' or allege any specific breach

1    of duty apart from reference to overbroad statutory violations." Dkt. 24 at 5. Brand Nutra

2    Defendants continue, "[a]dditionally, Plaintiff's complaint fails to define the 'BRAND

3    DEFENDANTS,' which create ambiguity and confusion regarding the scope of Plaintiff's

4    intended claims under Count One." *Id.* Defendants conclude that "such a broad characterization

5    of negligence does not comply with Fed. R. Civ. Proc. 8(a), which requires a short and plain

6    statement of the claim showing that the pleader is entitled to relief and a demand for judgment

7    for the relief the pleader seeks." *Id.* at 6. Defendants offer no case law other than *Twombly* and

8    *Iqbal* in support of their arguments. *See generally id.*

9         LeDoux replies that she has "provided a detailed context of the joint collaboration

10   between the THESIS and BRAND NUTRA DEFENDANTS in the manufacture of an

11   adulterated product amidst regulatory and product safety violations that were already the subject

12   of intervention by regulators." Dkt. 30 at 24. She details how the complaint "sets forth the

13   underlying background to explain BRAND NUTRA DEFENDANTS' role in the manufacture,

14   packing, and production" of the supplements. *Id.* at 7.

15        LeDoux's self-assessment is correct. As she explains, the complaint lays out the

16   partnership and joint responsibility between the Thesis and Brand Nutra Defendants. *Id.* at 8; *see,*

17   *e.g.*, Dkt. 1 at 6, 10, 13. The complaint explains that the Brand Nutra Defendants failed to

18   conduct necessary testing on products, Dkt. 1 at 13–15, and provides a warning letter from the

19   FDA regarding past adulteration at Defendant Brand Packaging Group, Dkt. 1-2.[3] The WPLA

20   provides that "[e]vidence . . . that the product was or was not, in compliance with

21

22   ───────────────
     [3] As a general rule, "a district court may not consider any material beyond the pleadings in ruling

23   on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)
     (quoting *Branch v. Tunnel*, 14 F.3d 449, 453 (9th Cir. 1994)). But a court may consider "material
     which is properly submitted as part of the complaint." *Id.* (quoting *Branch*, 14 F.3d at 453

24   (citation omitted).

nongovernmental standards or with legislative regulatory standards or administrative regulatory standards, whether relating to design, construction or performance of the product or to warnings or instructions as to its use may be considered by the trier of fact." RCW 7.72.050(1). LeDoux's allegations point to this type of evidence. *See generally* Dkt. 1-2.

Defendants also argue that LeDoux's complaint suffers from a fatal error: it does not allege that the supplements were the definitive cause of her amphetamine-positive urinalysis. Dkt. 32 at 3–4. While this may be true, LeDoux has alleged sufficient facts at this stage to draw this inference in her favor. She alleges there is evidence of adulteration of other Brand Packaging products, Dkt. 1-2, and she offers specific allegations of other unapproved ingredients in the Formula Nootropic Supplements, Dkt. 1 at 14–16. LeDoux is not required at this stage to prove every element of her claim, only to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

As Defendants themselves point out, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" Dkt. 32 at 3 (quoting *Ashcroft*, 556 U.S. at 678). LeDoux has done so here. Brand Nutra Defendants' claim is DENIED as to LeDoux's negligence claim.

## B.    Unfair Trade Practices

LeDoux also alleges that the Brand Nutra and Thesis Defendants engaged in unfair and deceptive practices under RCW 19.86.010, et seq. Dkt. 1 at 29. "To bring a private cause of action under the [Consumer Protection Act], Plaintiff must show the conduct: (1) is unfair or deceptive, (2) occurred in the conduct of trade or commerce, (3) affects the public interest, (4) injured Plaintiff in its business or property, and (5) caused Plaintiff's harm." *Innovative Sols. Int'l, Inc. v. Houlihan Trading Co.*, No. C22-0296-JCC, 2022 WL 10419055, at \*4 (W.D. Wash. Oct. 18, 2022) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn. 2d

778, 782, 719 P.2d 531 (Wash. 1986)). For the first two prongs, proof of an unfair or deceptive act "may be established by a showing that (1) an act or practice which has a capacity to deceive a substantial portion of the public (2) has occurred in the conduct of any trade or commerce." *Id.* (citing *Hangman Ridge*, 105 Wn. 2d at 785–86). On the third, public interest is "determined by a number of factors, depending on the context in which the actions were committed." *Id.* (citing *Hangman Ridge*, 105 Wn. 2d at 789–90). Such factors include "(1) whether the alleged act was committed in the course of defendant's business, (2) whether defendant advertised to the public, (3) whether defendant actively solicited this particular plaintiff, indicating the potential solicitation of others, and (4) whether plaintiff and defendant occupied unequal bargaining positions." *Id.* (citing *Hangman Ridge*, 105 Wn. 2d at 790–91).

LeDoux sufficiently pleads the first two prongs by claiming that she consumed the allegedly mislabeled and mis-marketed products which were purchased and distributed to consumers in Washington. *See id.* (similar). On the third prong, LeDoux alleges that the Brand Nutra Defendants "had the capacity to deceive a substantial portion of the public because tainted . . . products pose a serious health hazard to consumers of the end product." *Id.* Thus, "[a]t this stage of the proceedings this Court may reasonably infer, taking Plaintiff's allegations to be true. . . that [Defendants'] actions affect the public interest." *Id.*

Brand Nutra Defendants nonetheless claim that LeDoux's complaint remains too vague, "broadly attribut[ing] to all Defendants without reference to any facts corroborating the allegedly deceptive and unfair acts. By failing to allege deceptive and unfair acts performed by multiple named Defendants, Plaintiff fails to do more than recite the conclusory statutory claims." Dkt. 24 at 7. But Defendants—as they do throughout their motion—seem to ignore LeDoux's incorporation of the facts pled elsewhere in her complaint. Dkt. 1 at 29. In those other portions of

the complaint, Plaintiff pleads sufficient facts to conclude that Defendants either misrepresented or failed to disclose information about the supplements. *See, e.g.*, *id.* at 16, 19.

That said, the Brand Nutra Defendants do rightly point out that the claim fails to distinguish between their actions and those of the Thesis Defendants. Dkt. 24 at 7. "[T]here must be specific allegations explaining what each defendant allegedly did wrong, rather than general allegations asserted against them as a group." *Trusov*, 2023 WL 6147251, at *2. LeDoux "must identify what action each Defendant took that caused Plaintiffs' harm, without resort to generalized allegations against Defendants as a whole." *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 908 (N.D. Cal. 2018) (quoting *In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963, at *8 (N.D. Cal. Sept. 20, 2011)). Because the Brand Nutra Defendants may not have had any hand in the allegedly false statements made to consumers, and which could have deceived the public, LeDoux must parse out the actions taken by the Brand Nutra Defendants to sufficiently allege this claim.

Thus, Defendants' motion to dismiss LeDoux's unfair and deceptive practices claim is GRANTED. This claim is dismissed without prejudice. If LeDoux chooses to amend her complaint, she should provide greater specificity as to each Defendants' actions and potential liability.

## C.    Failure to Warn

Brand Nutra Defendants next challenge LeDoux's claim for failure to warn under the WPLA, RCW 7.72.010(4) and 7.72.030(1). Dkt. 24 at 7–8; Dkt. 1 at 30. They contend that the caption of the claim does not specify to which Defendants it applies. Dkt. 24 at 8. Thus, they conclude, "[w]hether Plaintiff alleges that BRAND NUTRACEUTICALS, INC. ("BRAND NUTRA") was also allegedly responsible for any design of the nootropic supplement "Formula," is vague, ambiguous, and/or unclear based on inconsistent representations regarding the narrow

scope of work and/or services performed by each Defendant previously represented by the Plaintiff's complaint." *Id.*

Throughout LeDoux's claim for failure to warn, she refers to the opposing parties as "[e]ach named DEFENDANT," "the DEFENDANTS," and "ALL DEFENDANTS." Dkt. 1 at 30–32. The Court believes that it is sufficiently clear—especially given that LeDoux also mentions manufacturing and packaging of the Formula—to find that she is referring to all Defendants for this claim.

The Brand Nutra Defendants raise no other issues with LeDoux's claim. Thus, Defendants' motion to dismiss LeDoux's failure to warn claim is DENIED. Because LeDoux may amend her complaint, she can provide specificity about the named Defendants for each of these claims if she so chooses.

**D.    Design and Manufacturing Defect**

Brand Nutra Defendants also challenge LeDoux's design and manufacturing defect claim brought under RCW 7.72.010(2), (4) and RCW 7.72.030. Dkt. 24 at 8–9; Dkt. 1 at 32. Defendants again raise concerns about who the claim refers to. Dkt. 24 at 8. As addressed above, this is a nonissue. *See supra* Sec. V.C. And, as laid out in the Court's discussion of negligence, LeDoux has pled sufficient facts for a strict liability or negligence claim under the WPLA. *Supra* Sec. V.A. LeDoux need not decide between theories of liability right now. *Id.*

Thus, Defendants' motion to dismiss LeDoux's design and manufacturing defect claim is DENIED.

**E.    Breach of Warranty**

Next, the Brand Nutra Defendants challenge LeDoux's claims for breach of warranty under RCW 7.72.010(4), 7.72.030(2)(b), and 7.72.040(1). Dkt. 24 at 9. Dkt. 1 at 33–34. "The language of the WPLA makes it abundantly clear that contractual privity is not required to bring

ORDER DENYING MOTION TO COMPEL ARBITRATION AND GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS - 28

a claim for breach of warranty." *Frisvold*, 2017 WL 3236972, at *3. Further, Washington's Supreme Court has held that "[a] product liability claim may be maintained against a manufacturer or other product seller notwithstanding an absence of contractual privity." *Id.* (quoting *Washington Water Power Co. v. Graybar Elec. Co.,* 112 Wn.2d 847, 851, 774 P.2d 1199 (Wash. 1989), amended sub nom. *Washington Power Co. v. Graybar Elec. Co.*, 779 P.2d 697 (Wash. 1989)). LeDoux is thus not required to plead facts demonstrating the existence of contractual privity between herself and the Nutra Brand Defendants. *See id.* (similar).

Still, Defendants argue, "[c]ritical to the analysis of potential liability on Plaintiff's claims for breach of warranty is whether the respective Defendants served as a manufacturer or product seller and whether the product conformed to an express warranty." Dkt. 24 at 9. And they maintain that LeDoux "fails to properly differentiate these claims as between the individual Defendants including the BRAND NUTRA DEFENDANTS and does not reference any express warranty." *Id.*

In response, LeDoux explains that she alleges that both the Thesis Defendants and the Brand Nutra Defendants acted as "product sellers *and* product manufacturers." Dkt. 30 at 22–23 (emphasis in original). And LeDoux notes that RCW 7.72.010(2) defines manufacturer to include "a product seller who designs, *produces*, *makes*, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer. The term also includes a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer." *Id.* at 22 (emphasis added). The statute thus covers Brand Nutra Defendants.

The WPLA imposes liability on product manufacturers for the implied warranty of merchantability. RCW 7.72.030(2). This warranty "encompasses consideration of fitness for ordinary purposes as well as the adequacy of the package and label." RCW 62A.2.314(2) (incorporated into RCW 7.72.030(2)). The warranty thus requires that the good be "fit for the

ordinary purposes for which such goods are used." *Brenner v. Vizio, Inc.*, No. C17-5897 BHS, 2018 WL 4566054, at *3 (W.D. Wash. Sept. 24, 2018) (citations omitted) ("The implied warranty of merchantability assures that the goods 'are fit for the ordinary purposes for which such goods are used.'"). "Factors such as the usage of the goods in a particular industry are considered when determining whether a product is merchantable." *Reynolds Metals Co. v. Alcan, Inc.*, No. C04-175L, 2005 WL 2789050, at *2 (W.D. Wash. Oct. 26, 2005) (citation omitted). Under the statute, merchantable goods are those that:

> (a) pass without objection in the trade under the contract description; and
>
> (b) in the case of fungible goods, are of fair average quality within the description; and
>
> (c) are fit for the ordinary purposes for which such goods are used; and
>
> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
>
> (f) conform to the promises or affirmations of fact made on the container or label if any.

RCW 62A.2-314(2). LeDoux alleges throughout her complaint that the product was adulterated and did not conform with the advertised purpose. *See generally* Dkt. 1.

Thus, LeDoux has sufficiently pled a claim for breach of warranty. Defendants' motion to dismiss is DENIED as to LeDoux's warranty claim.

## F.    Misrepresentation and Fraud

Finally, Brand Nutra Defendants challenge LeDoux's claim for misrepresentation and fraud under RCW 7.72.010(4) and 7.72.040(1). Dkt. 24 at 9–11; Dkt. 1 at 34. Defendants point out that the Ninth Circuit has "consistently held that cases that are 'grounded in fraud' or 'sound in fraud' must satisfy the particularity requirement" of Federal Rule of Civil Procedure 9(b). Dkt. 24 at 10 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003)).

1    LeDoux does not dispute that her claim for misrepresentation and fraud is subject to this higher

2    pleading standard. Dkt. 30 at 23. But LeDoux maintains that, by realleging and incorporating the

3    facts pleaded elsewhere in her complaint, she has satisfied the pleading requirement. *Id.* at 23–

4    24. This is unpersuasive.

5            Rule 9(b) serves two purposes. *United Healthcare*, 848 F.3d at 1180. First, "allegations

6    of fraud must be 'specific enough to give defendants notice of the particular misconduct which is

7    alleged to constitute the fraud charged so that they can defend against the charge and not just

8    deny that they have done anything wrong.'" *Id.* (quoting *Bly-Magee v. Cali.*, 236 F.3d 1014,

9    1019 (9th Cir. 2001)). Thus, "[p]erhaps the most basic consideration for a federal court in

10   making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b) . . . is the

11   determination of how much detail is necessary to give adequate notice to an adverse party and

12   enable that party to prepare a responsive pleading." *Id.* (quoting 5A Charles Alan Wright &

13   Arthur R. Miller, Federal Practice and Procedure § 1298 (3d ed. 2016)). "Second, the rule serves

14   'to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect

15   defendants from the harm that comes from being subject to fraud charges, and to prohibit

16   plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and

17   economic costs absent some factual basis.'" *Id.* (quoting *Bly-Magee*, 236 F.3d at 1018).

18           Rule 9(b) thus requires "plaintiffs to differentiate their allegations when suing more than

19   one defendant and inform each defendant separately of the allegations surrounding his alleged

20   participation in the fraud." *Fed. Trade Comm'n v. Amazon.com*, 735 F. Supp. 3d at 1326 (citing

21   *United Healthcare*, 848 F.3d at 1184). But "[t]here is no flaw in a pleading, [ ] where collective

22   allegations are used to describe the actions of multiple defendants who are alleged to have

23   engaged in precisely the same conduct." *Id.* (citing *United Healthcare*, 848 F.3d at 1184). In

24   other words, under the heightened pleading standard for fraud, a plaintiff must identify the role

of each defendant in the alleged fraudulent scheme, unless those defendants are alleged to have engaged in identical conduct. *Id.*

LeDoux has sufficiently plead a claim of fraud or misrepresentation against the Thesis Defendants. Throughout the complaint, she recounts the various statements made by the Thesis Defendants in advertisements about the supplements. Dkt. 1 at 8 ("The THESIS DEFENDANTS also market and sell their products as safe alternatives to stimulants, and as a means to 'address the challenges faced by those relying on stimulants.'"); *id.* at 9 (detailing a Facebook video that involves a doctor making a claim that the supplements are a side-effect free substitute for Adderall). She did "describe[] with particularity how each of the misrepresentations or omissions" is likely false. But each of these claimed misrepresentations or omissions are those of the Thesis Defendants—not the Brand Nutra Defendants. In this regard, LeDoux's allegations "provide no details linking [the Brand Nutra Defendants]. . . . Such allegations are insufficient under Rule 9(b)." *United Healthcare*, 848 F.3d at 1182. Because she does not allege identical behavior between the two parties, she cannot rely on her allegations against the Thesis Defendants to sustain her claim against the Brand Nutra Defendants. *Fed. Trade Comm'n v. Amazon.com*, 735 F. Supp. 3d at 1326 (citing *United Healthcare*, 848 F.3d at 1184).

Thus, the Brand Nutra Defendants' motion to dismiss is GRANTED as to Plaintiff's claim for misrepresentation and fraud against them. If a motion to dismiss is granted, then the "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Henry A. v. Willden*, 678 F.3d 991, 1005 (9th Cir. 2012). Thus, LeDoux is granted leave to amend her complaint to remedy these flaws.

## VI.    CONCLUSION

1

2

3

     For these reasons, the motion to compel arbitration, Dkt. 14, is DENIED without prejudice, and the motion to dismiss, Dkt. 24, is GRANTED in part and DENIED in part as set forth above. If LeDoux wishes to file an amended complaint, she must do so by March 11, 2025.

4

     Dated this 18th day of February, 2025.

5

6

Tiffany M. Cartwright
United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24