1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOANN LEDOUX,<br><br>     Plaintiff,<br><br>  v.<br><br>OUTLIERS, INC. (d/b/a THESIS, THESIS NOOTROPICS, FIND MY FORMULA, and FORMULA); DANIEL FREED; MATT RUBIN; BRAND NUTRACEUTICALS, INC. (d/b/a BRAND NUTRA); BRAND PACKAGING GROUP, INC. (d/b/a BRANDNUTRACEUTICALS); and John and JaneDoes 1-5,<br>     Defendants. | Case No. 3:24-cv-05808-TMC<br><br>ORDER DENYING MOTION TO DISMISS |

## I.    INTRODUCTION

Between March and September 2021, Plaintiff Joann LeDoux, a nurse in a military hospital, purchased nootropic supplement kits from Defendant Outliers, Inc. (doing business as Thesis or Thesis Nootropics). The company promised that the supplements supported cognitive function, claiming they were a natural alternative to stimulant-based medications like Adderall. But LeDoux alleges that the products actually contained amphetamines, a class of stimulants, and other ingredients that Thesis failed to disclose. When LeDoux was subject to a routine drug screening by the military, she tested positive for amphetamines. She alleges that the Thesis

ORDER DENYING MOTION TO DISMISS - 1

supplements are the probable source. Because of the positive drug screen, LeDoux was ultimately removed from her position. She lost access to her military benefits and both her mental and physical health deteriorated. And, after discontinuing the supplements, she claims she suffered severe withdrawal symptoms from the amphetamines and other undisclosed ingredients.

LeDoux sued Defendant Thesis, as well its corporate leadership, Defendants Daniel Freed and Matthew Rubin. Dkt. 1. She also sued the companies Thesis partnered with to manufacture and package their product—Defendants Nutraceuticals and Brand Packaging Group. *Id.* Defendants moved to dismiss, and the Court partially granted the motion, providing LeDoux leave to amend. Dkt. 39. LeDoux filed an amended complaint. Dkt. 45. She brings claims under Washington common law, the Washington Consumer Protection Act (CPA), and the Washington Product Liability Act (WPLA) for 1) negligence; 2) unfair trade practices; 3) failure to warn; 4) design and manufacturing defect; 5) breach of warranty; and 6) misrepresentation and fraud. *Id.*

Defendants Nutraceuticals and Brand Packaging Group ("the Brand Nutra Defendants") moved to dismiss or strike portions of LeDoux's amended complaint, claiming that she lacks standing to assert injuries caused by the undisclosed ingredients and arguing that punitive damages are unavailable for her claims. Because LeDoux has adequately pled injury-in-fact and a decision on the availability of punitive damages is premature, the Court DENIES the motion to dismiss. Dkt. 62.

## II.     FACTUAL BACKGROUND

Joann LeDoux lived in Tacoma, Washington from June 2018 through March 2023. Dkt. 45 ¶¶ 1, 82. LeDoux was an Army Nurse, specifically a Certified Registered Nurse Anesthetist, at Joint Base Lewis-McChord. *Id.* ¶¶ 82–83. LeDoux worked "long" hours and

sometimes "struggled with concentrating, remaining focused, alert, and awake during and after surgery." *Id.* ¶ 84. While dealing with these challenges at work, LeDoux saw several advertisements from the Thesis Defendants on social media. *See id.* ¶ 85. The advertisements were for Thesis's Formula Nootropic Supplements. *Id.* The advertisements represented that the supplements were a "safe, all-natural, [] better alternative" to prescription stimulants, such as Adderall. *Id.* LeDoux read the published ingredients list and decided to purchase the supplements. *Id.* LeDoux paid for the first month of a monthly subscription containing four packs of different Formula Nootropic Supplements. *Id.* ¶¶ 88, 90. She purchased the supplements eight more times. *Id.* ¶ 90. LeDoux began the subscription around March 18, 2021 and canceled her monthly subscription in late September or early October 2021. *Id.*

As part of her role at the Army Medical Center on Joint Base Lewis-McChord, LeDoux was subject to random drug screenings for controlled substances consumed without a valid and current prescription. *Id.* ¶¶ 100–01. In compliance with this policy, LeDoux submitted a urine sample on August 16, 2021. *Id.* ¶ 104. LeDoux's drug screen tested positive for the presence of amphetamines. *Id.* ¶ 106.

The military began an investigation into LeDoux's drug screen results. *See id.* ¶¶ 106, 110. As LeDoux explains in her complaint, "[w]hen a service member tests positive on a military urinalysis for a substance that is not facially illicit and for which a member could be authorized to take based on a prescription, the Army appoints what is known as a Medical Review Officer ('MRO')." *Id.* ¶ 107. The MRO asks about prescriptions not included in military records. *Id.* ¶¶ 108–09. LeDoux provided a list of over-the-counter substances she was taking then. *Id.* ¶ 112. But, without a prescription for amphetamines, she could not explain the cause of her positive result. *See id.*

1    Because LeDoux could not furnish a prescription for amphetamines, she was subject to a

2    military criminal trial. *Id.* ¶ 120. Ultimately, LeDoux lost her eligibility for a promotion from

3    Major to Lieutenant Colonel, was "administratively flagged," and "made to leave the military

4    before the expiration of her mandatory retirement date." *Id.* ¶¶ 127–28. Consequently, LeDoux is

5    "suffering the loss of a full pension from the US Military," and is "losing millions in bonuses,

6    pay, . . . and other military benefits." *Id.* ¶ 128. She was forced to participate in an "Impaired

7    Provider Program" at the military hospital where she worked and was directed to attend the

8    Army Substance Abuse Program. *Id.* ¶ 135. She had her security clearance revoked. *Id.* ¶ 136.

9    She fears that her state license to work as a Certified Registered Nurse Anesthetist will be

10   revoked. *Id.* ¶ 137. And LeDoux was "titled and indexed in the National Crime Information

11   Center (NCIC) database following the military law enforcement probable cause decision for

12   wrongful use of a controlled substance." *Id.* ¶ 133.

13        Upon discontinuing the supplements, LeDoux alleges she "suffered physiological

14   withdrawal effects[,]" such as "depression combined with cravings and dependency symptoms,

15   including that she was unable to stay awake, alert, or mentally present, despite ingesting copious

16   amounts of caffeine." *Id.* ¶ 130. LeDoux was diagnosed with severe clinical depression and

17   suicidal ideation, and she still has post-traumatic stress disorder. *Id.* ¶ 131. Because of her

18   custody arrangement, which requires she continue her military service, she may be forced to

19   relinquish custody of her children. *Id.* ¶ 132.

20        On September 25, 2024, LeDoux sued Defendant Outliers, Inc., (doing business as

21   Thesis, Thesis Nootropics, Find My Formula, and Formula), as well as Thesis's CEO Daniel

22   Freed and Director of Supply Chain Matthew Rubin. Dkt. 1. LeDoux also sued the Brand Nutra

23   Defendants, alleging that they "assist with the manufacture and packaging" of the Thesis

24

nootropic supplements. *Id.* at 10. These Defendants include Brand Nutraceuticals, Inc. and Brand Packaging Group, Inc. *Id.* at 2.

LeDoux alleges that the product contained amphetamines, despite claiming to be an alternative to traditional amphetamine-based medications (such as Adderall). *Id.* at 19. She alleges that the Thesis Formula Nootropic Supplement is "(a) wrongfully distributed, marketed, and sold for human consumption without the required premarket verification of safety; (b) contained ingredients and drugs obtained from outside the U.S.; (c) contained pharmaceuticals; and (d) caused dependence, addiction, and withdrawal in regular users." *Id.* at 27. LeDoux included a letter sent by the Food and Drug Administration (FDA) to Defendant Brand Group Packaging. *Id.* at 7; *see* Dkt. 1-2. The letter was sent following an inspection of the facilities that "revealed significant violations" of the FDA's requirements for manufacturing, packaging, labeling, and holding dietary supplements. Dkt. 1-2 at 1.

LeDoux brings claims under Washington common law, the Washington Consumer Protection Act (CPA), and the Washington Product Liability Act (WPLA) for negligence; unfair trade practices; failure to warn; design and manufacturing defect; breach of warranty; and misrepresentation and fraud. Dkt. 45 ¶¶ 144–97. Defendants moved to compel arbitration, or, in the alternative to dismiss. Dkt. 14. The Court denied the motion to arbitrate and partially granted the motion to dismiss with leave to amend. Dkt. 39. LeDoux amended her complaint, adding allegations based on information gathered in early discovery. Dkt. 45. LeDoux claims that the Formula Supplements contained New Dietary Ingredients (NDIs) not listed in the ingredients. *See id.* ¶ 60. Some of these ingredients have not been verified as safe for human consumption. *Id.* ¶¶ 68, 70. Others have been identified "as a drug that is possibly marketed outside the United States" but not approved for use as a drug in the country. *Id.* ¶¶ 64–65. LeDoux alleges that, had she known of the contents, she would not have purchased the product. *Id.* ¶ 98.

The Brand Nutra Defendants moved to dismiss the amended complaint. Dkt. 62. The Thesis Defendants joined the motion. Dkt. 76. The Brand Defendants argue that LeDoux lacks standing to allege harm because of the NDIs found in the Formula supplements. Dkt. 62 at 3–5. They also argue that punitive damages for Plaintiff's claims under the CPA and WPLA are prohibited because they are not authorized by statute. *Id.* at 6. They request that either the claims be dismissed under Rule 12(b)(1) or stricken under 12(f). *Id.* at 5. LeDoux responded. Dkt. 79. In reply, Defendants raised a new preemption argument, asserting that Plaintiff's claims sound in Food, Drug, and Cosmetics Act (FDCA) violations and are preempted because the FDA has sole authority to enforce the FDCA. *Id.* at 3–5. The briefing is complete, and the motion is ripe for the Court's consideration. Oral argument is unnecessary.

### III.    LEGAL STANDARD

**A.    Motion to Dismiss**

A Rule 12(b)(1) motion seeks dismissal of a claim for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Such challenges may be either "facial" or "factual." "A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.* When, as here, the Court responds to factual attacks on subject matter jurisdiction, plaintiffs "must present 'affidavits or any other evidence necessary to satisfy [their] burden of establishing that the court, in fact, possesses subject matter jurisdiction.'" *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (alteration in original) (quoting *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009)). "Once the moving party has converted the motion to dismiss into a factual motion by presenting

affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

**B.    Motion to Strike**

A court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "In deciding a Rule 12(f) motion to strike, a court should not resolve disputed and substantial factual or legal issues." *In re Amazon Serv. Fee Litig.*, 705 F. Supp. 3d 1255, 1263 (W.D. Wash. 2023) (citing *Whittlestone, Inc. v. Handi-Craft Co.,* 618 F.3d 970, 973–75 (9th Cir. 2010)). "The function of a [Rule] 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial[.]" *Id.* (citing *Whittlestone Inc.*, 618 F.3d at 973). Rule 12(f) motions "are generally disfavored because the motions may be used as delay tactics and because of the strong policy favoring resolution on the merits." *Id.* (citation omitted). The burden falls on the moving party and the court should view the pleading in the light most favorable to the nonmoving party. *Polaris PowerLED Techs., LLC v. Nintendo Co.*, 623 F. Supp. 3d 1132, 1136 (W.D. Wash. 2022) (citations omitted).

"Ordinarily, a motion to strike will not be granted unless 'the matter has no logical connection to the controversy at issue and may prejudice one or more of the parties to the suit.'" *Id.* (quoting *N.Y.C. Emps. Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009)). "[A]llegations that provide background information, historical material, 'or other matter of an evidentiary nature will not be stricken unless unduly prejudicial to [the moving party].'" *Id.* (quoting *Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1085 (S.D. Cal. 2017)).

## IV.    DISCUSSION

1

**A.      LeDoux has sufficiently alleged an injury-in-fact, satisfying Article III standing.**

2

The Brand Defendants argue that LeDoux's allegations regarding NDIs suffer a "fatal

3

problem" in that they "fail to allege any adverse effect, injury, or damage resulting from her

4

alleged exposure to NDIs[.]" Dkt. 62 at 2–3. They argue that LeDoux "asserts no palpable and

5

distinct harm from her alleged exposure to NDIs." *Id.* at 4. Accordingly, Defendants claim,

6

LeDoux's "allegations concerning NDIs fail to meet the requirements for Article III standing."

7

*Id.* Defendants do not address this argument in their reply. *See generally* Dkt. 85.

8

"[T]o satisfy Article III's standing requirements, a plaintiff must show 'injury in fact,'

9

causation, and redressability." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528

10

U.S. 167, 168 (2000) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992)).

11

Defendants do not challenge causation or redressability, only injury-in-fact. *See generally*

12

Dkt. 62. An injury-in-fact must be concrete and particularized and actual or imminent, rather

13

than merely conjectural or hypothetical. *Lujan*, 504 U.S. at 560. Although a plaintiff may not

14

rely on a "bare legal conclusion to assert injury-in-fact . . . the threshold question of whether

15

plaintiff has standing (and the court has jurisdiction) is distinct from the merits of his claim."

16

*Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). As such, "general factual allegations

17

of injury resulting from the defendant's conduct may suffice." *Id.*

18

Despite Defendants' contentions, LeDoux alleges several injuries she suffered from

19

exposure to the NDIs. *See* Dkt. 79 at 15–17. For example, LeDoux alleges that, had she been

20

"truthfully informed" of the contents of the supplements, she would not have purchased or used

21

the products. Dkt. 45 ¶ 98. In *Maya v. Centex Corporation*, the Ninth Circuit clarified that, where

22

a plaintiff purchases something because of a defendants' misrepresentations about the product—

23

but would not have if the plaintiff had known the truth—the plaintiff has shown economic injury.

24

658 F.3d at 1069. Such "[e]conomic injury is clearly a sufficient basis for standing." *Id.* (quoting

*San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996)); *see also Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co*., 796 F. App'x 919, 921 n.1 (9th Cir. 2019) ("We have held in the consumer fraud context that where plaintiffs contend that they bought a product when they otherwise would not have done so, because Defendants made deceptive claims and failed to disclose known risks[,] they have suffered an injury in fact sufficient to support Article III standing.") (cleaned up).

And several cases have found economic injury present where a plaintiff would not have purchased a consumer product had the plaintiff known of an undisclosed ingredient. *Howard v. Alchemee, LLC*, No. 2:24-CV-01834-SB-BFM, 2024 WL 4272931, at *3 (C.D. Cal. Sept. 19, 2024) (benzene in skincare); *Barnes v. Nat. Organics, Inc*., No. EDCV22314JGBPLAX, 2022 WL 4283779, at *1 (C.D. Cal. Sept. 13, 2022) (prenatal vitamins containing heavy metals); *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 846 (N.D. Cal. 2018) (lead, arsenic, and BPA in dog food); *Maisel v. S.C. Johnson & Son, Inc.*, No. 21-CV-00413-TSH, 2021 WL 1788397, at *3 (N.D. Cal. May 5, 2021) (plant-based dishwasher tablets); *Bohac v. Gen. Mills, Inc.*, No. 12-CV-05280-WHO, 2014 WL 1266848, at *10 (N.D. Cal. Mar. 26, 2014) (ingredients in cereal).

Thus, LeDoux has sufficiently alleged an injury-in-fact at this stage. The claims should not be dismissed nor stricken.

**B.     The Court need not decide the availability of punitive damages at this stage.**

Defendants also claim that LeDoux cannot assert punitive damages because her claims are brought under the CPA and WPLA—statutes that do not allow for punitive damages. Dkt. 62 at 6. Thus, Defendants argue, the punitive damages claims should be dismissed. *Id.* In response, LeDoux argues that the CPA does authorize "exemplary damages"—"'treble' damages upon appropriate findings." Dkt. 79 at 30 (first citing *McKee v. AT&T Corp.*, 164 Wn.2d 372, 401, 191 P.3d 845 (2008); and then citing *BBC Grp. NV LLC v. Island Life Rest. Grp. LLC*, No. C18-1011

RSM, 2020 WL 758070, at *7 (W.D. Wash. Feb. 14, 2020)). And LeDoux argues that she is "entitled to pursue punitive damages under New York law, unless foreclosed under a conflict-of-laws analysis." *Id.* In reply, Defendants maintain that Washington, not New York, law applies. Dkt. 85 at 6–7.

When "a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *see also Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005) (same). LeDoux claims diversity jurisdiction. Dkt. 45 ¶ 10–11. Thus, the Court applies the choice-of-law rules of Washington in assessing the availability of punitive damages. *McCarthy v. Amazon.com, Inc.*, 679 F. Supp. 3d 1058, 1067 (W.D. Wash. 2023) (citing *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001)).

"Under Washington law, when parties dispute choice of law, there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before the court will engage in a conflict-of-laws analysis." *Id.* (citing *Erwin v. Cotter Health Ctrs.*, 161 Wn.2d 676, 167 P.3d 1112 (2007)). An "actual conflict" exists where the result of a particular issue would be different under the law of the two states. *Id.* (citing *Erwin*, 161 Wn.2d at 1120). Absent an actual conflict, Washington law applies. *Id.*

If actual conflict exists, the Court applies the "most significant relationship" test. *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App. 137, 143, 210 P.3d 337, 340 (2009). In determining which jurisdiction has the most significant relationship to a particular issue, which in this case is the availability of punitive damages, the Court first weighs "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the

1    place where the relationship, if any, between the parties is centered." *Singh*, 151 Wn. App. at

2    143. If these contacts are balanced, the second step is to consider "the public policies and

3    governmental interests of the concerned states." *Id.* at 144.

4         LeDoux brings claims under both the Washington Consumer Protection Act (CPA) and

5    the Washington Products Liability Act (WPLA). Dkt. 45. The Court starts with her CPA claims.

6    A party injured by a CPA violation may recover actual damages and costs, including a

7    reasonable attorney's fee. RCW 19.86.090. Further, the court "may, in its discretion, increase the

8    award of damages to an amount not more than three times the actual damages sustained," subject

9    to a statutory limit of $25,000. *Id.* LeDoux requests "punitive damages to the full extent allowed

10   by applicable law, in light of the principles and policies of Chapter 19.86 RCW and/or the

11   substantive laws of New York[.]" Dkt. 45 at 44. She also requests "general and special

12   damages[.]" *Id.* Because the CPA allows both actual and treble damages, this request need not be

13   dismissed for LeDoux's CPA claims.

14        Turning next to the WPLA claims, Plaintiff argues that although the WPLA does not

15   allow for punitive damages, New York law (where the companies are citizens) should govern

16   punitive damages. Dkt. 79 at 30. There is an actual conflict here: Washington generally prohibits

17   punitive damages unless expressly authorized by statute—and the WPLA does not authorize

18   punitive damages. *Id.* at 31; *Erickson v. Pharmacia LLC*, 31 Wn. App. 2d 100, 134, 548 P.3d

19   226, *review granted sub nom. Erickson v. Pharmacia LLC.*, 556 P.3d 1098 (Wash. 2024)

20   ("Because WPLA has not expressly authorized punitive damages, they are not authorized for

21   WPLA claims under Washington law."). Thus, if Washington law applies, punitive damages are

22   unavailable as a matter of law. But New York law authorizes punitive damages in product

23   liability and fraud cases where the defendant's conduct "evinces a high degree of moral

24

culpability" or "shows a conscious disregard of the rights and safety of others." Dkt. 79 at 31 (quoting *Home Ins. Co. v. Am. Home Prods. Corp.*, 75 N.Y.2d 196, 203–04 (1990)).

Yet this is not a question that the Court needs to—or should—resolve at this stage. As a general matter, "the Washington State Supreme Court is wary to dismiss questions that turn on a choice of law at the Rule 12(b)(6) stage, as the analysis in a given case 'depends upon the underlying facts of that case.'" *Aguirre v. Easy Automation, Inc.*, No. 4:24-CV-5040-TOR, 2024 WL 4895703, at *2 (E.D. Wash. Nov. 26, 2024) (citation omitted). LeDoux has not yet had the chance to engage in discovery about the location where the supplements were designed, manufactured, and distributed; the location where any NDIs or amphetamines were discovered; or the location of any potential decision not to warn consumers. *See generally* Dkt. 45. Accordingly, "[b]ased on the allegations in the complaint alone, the court does not have sufficient information to make a determination one way or another which state has the most significant relationship to the issue of punitive damages." *Farmer v. I-Flow Corp.*, No. C13-826 RAJ, 2013 WL 12145954, at *2 (W.D. Wash. Sept. 25, 2013). Thus, "[t]he Court reserves its judgment pending further development of the factual record." *Davis v. Edgewell Pers. Care Brands, LLC*, No. 2:18-CV-00057-SAB, 2018 WL 1975685, at *4 (E.D. Wash. Apr. 26, 2018) (similar).

Reserving judgment on choice of law is also prudent because the same issue is pending right now before the Washington Supreme Court. In *Erickson v. Pharmacia LLC*, a trial court allowed the jury to consider and award damages under Missouri law for a claim brought under the WPLA. 31 Wn. App. 2d at 132. Missouri law, like New York's, allowed the plaintiffs to claim punitive damages. *Id.* (citing cases). The jury awarded punitive damages, and the defendants appealed. *Id.* at 109–10. The appeals court explained that "Washington courts have applied a separate choice-of-law analysis to the issue of punitive damages for tort claims,

analyzing" a different set of factors "to determine which state has the most significant interest." *Id.* at 134 (citing cases). "In doing so, courts have sometimes engaged in dépeçage[1] and, after analyzing the issue of punitive damages, have determined that a different state's law applies to punitive damages than to the underlying tort liability claim." *Id.* Ultimately, the court concluded, "to the extent Missouri's product liability law prohibits the same conduct as prohibited by WPLA, plaintiffs may seek punitive damages because Missouri has a more significant interest pursuant to an analysis of relevant contacts." *Id.* at 137.

The defendant appealed, and the case is now before the Washington Supreme Court. *See Erickson v. Pharmacia LLC.*, 556 P.3d 1098 (Wash. 2024). In their briefing, the defendants argued that the court should vacate the punitive damages award because conflict-of-law principles demand the application of Washington's punitive damages law. *Erickson v. Pharmacia LLC.*, 2022 WL 1480184, at *4. When a federal court is deciding an issue of state law, it is "bound by the pronouncements of the state's highest court on applicable state law." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (citing *Davis v. Metro Productions, Inc.*, 885 F.2d 515, 524 (9th Cir. 1989)); *Fid. Union Tr. Co. v. Field*, 311 U.S. 169, 177 (1940) ("The highest state court is the final authority on state law.") (citations omitted). Given the likelihood of a binding forthcoming decision from the Washington Supreme Court, and that a motion to dismiss is not the proper vehicle to assess these claims, the Court DENIES Defendants' motion as to punitive damages without prejudice.

---

[1] A principle under which "different issues in a single case arising out of a common nucleus of facts may be decided according to the substantive law of different states." *Erickson*, 31 Wn. App. 2d at 116 (quoting *FutureSelect Portfolio Mgmt. Inc. v. Tremont Grp. Holdings, Inc.*, 175 Wn. App. 840, 856 n.15, 309 P.3d 555 (2013)).

ORDER DENYING MOTION TO DISMISS - 13

**C.    The Court will not consider arguments raised for the first time in reply.**

Lastly, Defendants raise a new argument in their reply, asserting that LeDoux's allegations regarding the NDIs should be stricken because they are no more than an attempt to enforce the Food and Drug Cosmetic Act (FDCA). Dkt. 85 at 3. Because the FDCA does not allow a private right of action to enforce its provisions, Defendants argue, any claims that sound in an FDCA violation are preempted and must be dismissed. *Id.* at 3–5.

The Court will not entertain this argument. "It is well established that new arguments and evidence presented for the first time in [r]eply are waived." *California Expanded Metal Prods. Co. v. Klein*, 426 F. Supp. 3d 730, 743 (W.D. Wash. 2019) (quoting *Docusign, Inc. v. Sertifi, Inc.*, 468 F. Supp. 2d 1305, 1307 (W.D. Wash. 2006)); *see also United States v. Patterson*, 230 F.3d 1168, 1172 n.3 (9th Cir. 2000)) (refusing to consider new argument raised in reply) (citing cases).

## V.    CONCLUSION

For these reasons, the Motion to Dismiss, Dkt. 62, is DENIED.

Dated this 16th day of May, 2025.

Tiffany M. Cartwright
United States District Judge