1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

JOANN LEDOUX,

9

Plaintiff,

10

v.

11

OUTLIERS, INC. (d/b/a THESIS, THESIS
NOOTROPICS, FIND MY FORMULA, and
FORMULA), et al.

12
13

Defendants.

Case No. 3:24-cv-05808-TMC

ORDER GRANTING DEFENDANTS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT

14
15

**I.    INTRODUCTION**

16

Between March and September 2021, Plaintiff Joann LeDoux, a nurse for the Army,

17

purchased Defendants'[1] nootropic supplement kits. Dkt. 45 ¶ 100; Dkt. 113-1 at 239–41.

18

Plaintiff alleges these supplements were adulterated with amphetamines and other ingredients

19

that Defendants failed to disclose. Dkt. 45 ¶¶ 92–94. Her primary theory of liability is that the

20

supplements caused her to test positive on a routine drug screening and resulted in a court

21

martial, a missed promotion, and various other damages. *Id.* ¶¶ 100–38. Defendants seek

22
23
24

[1] Defendants include Outliers, Inc. (doing business as Thesis Nootropics), Brand Nutraceuticals, Inc. (doing business as Brand Nutra), Brand Packaging Group, Inc., and one to five unidentified Doe defendants. Dkt. 45 ¶¶ 2–9. Although Plaintiff also sued Daniel Freed and Matt Rubin— Thesis's CEO and Director of Supply Chain, respectively—the Court dismissed these claims without prejudice on October 28, 2025. *Id.* ¶¶ 3–4; Dkt. 169.

dismissal of Plaintiff's claims to the extent they rely on this theory. Dkt. 112. Defendants also ask the Court to strike expert evidence that was provided late and in violation of Federal Rule of Civil Procedure 26. Dkt. 194.

The Court GRANTS IN PART Defendants' motion to exclude and strike Plaintiff's expert evidence. *Id.* Expert evidence provided by Drs. Dezell, Okano, and Shippee, along with Mr. Kababick's second report, is STRICKEN from the record and may not be used "to supply evidence on a motion, at a hearing, or at trial." Fed. R. Civ. P. 37(c)(1).

Because Plaintiff has not produced evidence from which a reasonable jury could find that Defendants' supplements caused her positive urinalysis, the Court also GRANTS IN PART Defendants' motion for partial summary judgment. Dkt. 112. Plaintiff's claims are DISMISSED WITH PREJUDICE to the extent they (1) rely on allegations of amphetamine adulteration and (2) claim damages caused by Plaintiff's positive test for amphetamines. Defendants' motion for partial summary judgment is DENIED IN PART with respect to the argument that Plaintiff's CPA claim is not legally cognizable, which the Court already rejected in its order on an earlier motion to dismiss. *See* Dkt. 169.

## II.    BACKGROUND

The following facts are either not genuinely disputed in the summary judgment record or are taken in the light most favorable to Plaintiff, the non-moving party.

### A.    Facts

#### 1.    *Plaintiff's use of Thesis products and positive urinalysis*

Founded in 2017, Thesis sells over-the-counter "nootropic" supplements which Thesis markets as improving cognitive function. Dkt. 190-54 at 3–4; Dkt. 190-28 at 166–173. Brand Nutra and Brand Packaging Group, Inc. ("Brand") contract with Thesis to assist in the manufacturing, production, packaging, and labeling of these supplements. Dkt. 45 ¶¶ 38–40.

After seeing Instagram advertisements for Thesis products, Plaintiff took a quiz offered by Thesis to "generate a specific collection of their products that they characterize[d] as personalized for her needs, and the desired cognitive improvements." Dkt. 190-30 at 10; Dkt. 45 ¶¶ 87–88. Plaintiff then purchased a monthly subscription to the four types of capsules recommended based on her quiz results—labeled "Logic, Motivation, Energy, and Clarity." Dkt. 190-30 at 19; Dkt. 45 at 89. Plaintiff described her use of the supplements as follows:

> I took something every day because, you know, you could take them up to two times a day, depending on how you felt, because that was the point of the formula—of my formula and the supplements, is that if you're feeling really exhausted that morning when you wake up, you take an energy one. Or, like, if I knew I was going to have a presentation at morning report, I would take Logic. And then I would take Energy in the afternoon if I knew I was going to have a lot of stuff going on with my kids. So I had them everywhere, and—in order to be able to have access to taking them, because you could take them up to twice a day.

Dkt. 190-30 at 20. Plaintiff purchased and ingested the same four Thesis products from mid-March 2021 through the end of September 2021. Dkt. 113-1 at 241; Dkt. 45 ¶ 90.

As part of a routine drug screening, Plaintiff provided a urinalysis sample to the military on August 16, 2021. Dkt. 113-1 at 141. On September 27, 2021, she learned that her sample tested positive for amphetamines. *Id*. at 141, 145. Plaintiff's urine contained 4,997 nanograms per milliliter of D-amphetamine. *Id*. at 145, 225. Moreover, it contained a three-to-one ratio of D-amphetamine to L-amphetamine, the "exact proprietary blend of ingredients" for the drug sold under the brand name Adderall. *Id*. at 226; Dkt. 45 ¶ 94.

The Army began an investigation and flagged Plaintiff's officer record brief for "IL-DRUG ABUSE ADVERSE ACTION," precluding her promotion during the investigation. Dkt. 190-2; Dkt. 190-3 at 3–4. Plaintiff was not promoted in fiscal year ("FY") 2021, after having already been passed over for promotion in 2020. Dkt. 190-10 at 2–4. As a Major on the active duty list ("ADL") not selected for promotion to Lieutenant Colonel for a second time,

Plaintiff was subject to involuntary discharge in 2025, after over 20 years in the Army. *Id.*; Dkt. 190-5 at 2–4. Plaintiff was eligible for "selective continuation," meaning she would also be considered for promotion in FY22–24, but she was given an effective retirement date of May 31, 2025. Dkts. 190-7, 190-8. Plaintiff was not promoted and received her Form DD-214 certifying her discharge from active duty on April 11, 2025. Dkt. 190-9.

On May 15, 2025, after Plaintiff had separated from the Army and no longer had her government email or Common Access Card privileges, she received a phone call informing her that she was selected for promotion and could remain in the Army. Dkt. 190-10 at 4–5. Plaintiff decided to stay in the Army and was promoted to Lieutenant Colonel, and her DD-214 was voided. *Id.* at 4; Dkts. 190-11, 190-15. Plaintiff claims that her positive urinalysis and resulting investigation and court martial caused her to be passed over for promotion in 2021. Dkt. 190-10 at 3.

### 2. Testing of Thesis supplements

Plaintiff stopped taking Thesis supplements on September 27, 2021, the day she learned of her positive urinalysis result. Dkt. 190-30 at 47. Plaintiff took a separate LabCorp urinalysis on October 4, 2021, along with a hair follicle test designed to detect long-term amphetamine use. Dkt. 190-57 at 10; Dkt. 190-28 at 63, 179. Both tests came back negative. Dkt. 190-28 at 63, 179. Later, Plaintiff sent her Thesis supplements to be tested for amphetamines at NSF International. Dkt. 113-1 at 127–28, 150–51. NSF tested each supplement Plaintiff had been consuming and did not detect amphetamine "in any of the four products." *Id.* at 128–29, 162. Plaintiff also testified during her court martial that she was subject to three additional Army urinalyses after her positive test. Dkt. 190-30 at 48. Although the judge precluded testimony about the results of those tests as inadmissible hearsay, the Court accepts Plaintiff's offered inference that "if the results had been positive, the panel members would have learned of it." *Id.*

at 48–49; Dkt. 190-1 at 6. Of the 31 drug screenings throughout Plaintiff's military career, the August 16, 2021 urinalysis was the only instance where she tested positive. Dkt. 190-47 at 5.

Brand and Thesis preserve "representative samples" of supplement batches they sell, and in 2023 they sent samples from "every lot of supplements that could have gone to [Plaintiff]" to a third-party laboratory called Alkemist Labs. Dkt. 112 at 7; Dkt. 113-1 at 14–15, 175–95. Alkemist Labs also detected no amphetamines. *Id*. at 175–95.

Plaintiff was taking several other medications around the time of her positive urinalysis, including Tylenol, Sudafed, Spironolactone, and Zoloft. Dkt. 113-1 at 27, 141–42. She did not preserve these medications or test them for amphetamines. *Id*. at 207–08, 264.

### 3.    *Plaintiff's court martial*

Plaintiff's court martial, where she was charged with wrongfully using amphetamine, took place in December 2022. Dkt. 190-17. The court heard testimony from Plaintiff, Daniel Freed (Thesis's CEO), and various experts, character witnesses, investigators, and individuals involved with testing Plaintiff's urinalysis samples. Dkts. 190-21–190-58. Plaintiff was ultimately acquitted of the charge. Dkt. 113-1 at 204. Several pieces of testimony and evidence from the court martial are especially relevant to the present motion.

First, Dr. Catherine Okano testified for the government "as an expert in the field of forensic drug testing, specifically for urinalysis by the DOD, and pharmacology." Dkt. 190-21 at 6. Dr. Okano also oversaw the lab that processed Plaintiff's August 2021 positive urinalysis. *Id*. at 3, 10–12. Dr. Okano testified that the sample assigned to Plaintiff tested positive for amphetamine three times: once upon an initial screening, again using the same screening process but "a kit from another manufacturer," and a third time using gas chromatography-mass spectrometry ("GC-MS"). Dkt. 190-21 at 20–22. The GC-MS analysis showed the sample contained 4,997 nanograms of D-amphetamine per milliliter of urine, far above the Department

of Defense's cutoff of 100 nanograms. *Id*. at 23. Dr. Okano also testified that the urine contained a three-to-one ratio of D-amphetamine to L-amphetamine, the proprietary mixture of Adderall and "consistent with Adderall use." *Id*. at 24. Lastly, Okano recalled that one of the 116 samples in the same batch as Plaintiff's sample was flagged as "out of sequence." Dkt. 113-1 at 230–31. Plaintiff's attorney argued during closing arguments that this fact supported a not guilty verdict. *Id*. at 4–5.

Second, Freed testified that Thesis does not intentionally put amphetamines or any other controlled substance in its supplements. Dkt. 190-54 at 22. He also testified, however, that neither Thesis nor Brand screens the ingredients in Thesis supplements for amphetamines. *Id*. at 19. He testified that Brand has the "Good Manufacturing Practice" certification from NSF, the same company that tested Plaintiff's supplements for amphetamines, and that Brand's facilities are "regularly inspected by the FDA." Dkt. 190-53 at 22–23. Freed estimated that Thesis had 200,000 customers over its lifetime, and, to his knowledge, no military service member had ever tested positive from the use of Thesis supplements. *Id*. at 24, 28.

Third, Plaintiff testified about her purchase and use of Thesis supplements, including that she consumed one or two packets every day for several months. Dkt. 190-30 at 17–20. The supplements improved her focus and helped her stay awake during the day. *Id*. at 32–33. On the morning of August 16, 2021, Plaintiff received a WhatsApp group text from her commander that her unit would be subject to a urinalysis test that same day. *Id*. at 38–41. She reported to the exam and did not "have any concern at all" about the urine sample she provided. *Id*. at 40. But while Plaintiff was at a yoga class on September 27, 2021, Plaintiff's commander called to inform her that she had tested positive. *Id*. at 39–40. She testified that she felt shocked and confused. *Id*. She began crying as she drove home from the class and "pulled over because [she] didn't want to crash [her] car." *Id*. at 40. She reported thinking "what was different? What did I

do? . . . that's when I had realized the only thing that was different were the medications I was on." *Id*. at 47–48. Finally, she testified that none of her children or friends have prescriptions for Adderall, and that she had never knowingly ingested amphetamines or Adderall. *Id*. at 52–54.

### B.    Procedural history

Thesis, Freed, and Thesis Director of Supply Chain Matt Rubin filed the present motion on August 12, 2025. Dkt. 114. Brand joined the motion three days later. Dkt. 120. After receiving an extension to conduct additional discovery under Federal Rule of Civil Procedure 56(d), Plaintiff responded to the motion on October 17, 2025.[2] Dkt. 159; *see* Dkts. 127, 132, 133. Defendants filed their reply on October 24, 2025. Dkt. 168.

While the summary judgment motion was pending, the Court granted a motion to dismiss all claims against Freed and Rubin under Federal Rule of Civil Procedure 12(b)(6), reasoning that Plaintiff failed to allege their personal involvement in the alleged misconduct. Dkt. 169. Plaintiff filed a motion to amend the complaint, which is still pending before this Court and will be addressed in a separate order. Dkt. 173.

The court held a hearing on the present motion on December 2, 2025. Dkt. 184. There, Plaintiff's counsel stated that she planned to rely on two expert reports that were not disclosed by the expert disclosure deadline of October 22, 2025 and had not been included with her summary judgment opposition. Dkt. 187 at 20–24, 29–30, 38. The Court allowed Defendants to choose whether they would move to strike the reports or, alternatively, force Plaintiff to move for leave to supplement the summary judgment record. *Id*. at 47–49. Choosing the former, Defendants proposed a briefing schedule for their opposition to the late disclosure. Dkt. 185. The Court then

---

[2] Plaintiff later re-filed her response on December 8, 2025, Dkt. 190, to comply with the Court's order that she file all exhibits via ECF and include pincites to relevant portions of those exhibits in her brief. Dkt. 187 at 36–38.

adopted Defendants' proposed schedule in part, resetting the dispositive motion deadline to January 19, 2026. Dkt. 186.

Defendants filed a motion to exclude and strike the new expert reports on December 10, 2025. Dkt. 194. Plaintiff improperly filed a 30-page opening brief on the issue, instead of a response, on December 17, 2025. Dkt. 196. Then, on December 18—five minutes past the December 17 deadline—Plaintiff filed her response. Dkt. 197. Defendants filed their reply on December 22, 2025. Dkt. 201.

### III.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1122 (9th Cir. 2024) (quoting *Anderson*, 477 U.S. at 256).

The evidence relied upon by either party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a

matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). However, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (alteration in original) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

## IV.    DISCUSSION

Asserting that "[t]his is a no-evidence motion for summary judgment," Defendants ask the Court to reject Plaintiff's primary theory of liability—that Thesis supplements were adulterated with amphetamine and Plaintiff's consumption of those supplements caused her positive urinalysis on August 16, 2021 that resulted in a delayed promotion and other damages. Dkt. 187 at 4; Dkt. 112 at 9–16. Specifically, Defendants argue that Plaintiff (1) lacks the expert testimony necessary under Washington law to meet the heightened standard of causation in a medically complex case; (2) lacks evidence to establish but-for causation, even if the heightened standard did not apply; (3) lacks evidence to show that a positive urinalysis, however it was caused, delayed her promotion. *Id.* at 9–18; Dkt. 168 at 12–13.[3]

---

[3] Defendants also argued initially that Plaintiff's CPA claim was "legally barred" for "the same reasons given in Thesis's pending motion to dismiss." Dkt. 112 at 16. The Court rejected those arguments in its order on the motion to dismiss, *see* Dkt. 169, and at oral argument Thesis

In response, Plaintiff primarily argues that the motion is procedurally deficient—that it improperly seeks an evidentiary ruling and does not challenge or defeat any specific claim. Dkt. 190 at 20–34. She dedicates roughly three pages of her responsive brief to the evidence which she claims supports an inference of causation. *Id*. at 34–37.

**A.    Defendants' motion is procedurally sufficient.**

Defendants seek summary judgment on Plaintiff's claims to the extent they rely on her urinalysis theory—that Plaintiff consumed Thesis products adulterated with amphetamines, which caused her to test positive on a routine drug screening and disrupted her promotion in the Army. Dkt. 112 at 9–16. Plaintiff argues that "[w]hile [Defendants] style their motion as one for partial summary judgment, they are improperly seeking only evidentiary rulings." Dkt. 190 at 8. According to Plaintiff, "[p]arties may not use motions for partial summary judgment for the stand-alone purpose of establishing facts." *Id*. at 20 (first citing *Mullaney v. Hilton Hotels Corp.*, 634 F. Supp. 2d 1130, 1161 (D. Haw. 2009); then citing *SFM Corp. v. Sundstrand Corp.*, 102 F.R.D. 555, 558 (N.D. Ill. 1984); and then citing *Matsuura v. E.I. du Pont de Nemours & Co.*, No. CIV. 00-00615SOM-LEK, 2007 WL 602204, at *2 (D. Haw. Feb. 16, 2007)).

Plaintiff's arguments lack merit. Plaintiff cites cases pertaining to Federal Rule of Civil Procedure 56(g), which allows district courts to "enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established" even when they would otherwise deny a motion for summary judgment under Rule 56(a). These cases explain that because Rule 56(g) cannot support "a stand-alone motion," *Matsuura*, 2007 WL 602204, at *2, that rule "does not authorize the initiation of motions the sole object of which is to adjudicate issues of fact which are not dispositive of any claim or part thereof." *Mullaney*, 634 F. Supp. 2d at 1161

---

conceded that this resolved the instant summary judgment argument as well. Dkt. 187 at 18:11–23.

ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 10

1  (quoting *SFM Corp.*, 102 F.R.D. at 558). In other words, these cases stand for the proposition

2  that Rule 56(g) "is not to be viewed as a device to obtain adjudications of non-dispositive fact

3  issues." *SFM Corp.*, 102 F.R.D. at 558.

4      Here, however, Defendants have properly moved for partial summary judgment under

5  Rule 56(a). Dkt. 112 at 9. The first sentence of Rule 56(a) provides: "A party may move for

6  summary judgment, identifying each claim or defense—*or the part of each claim or defense*—on

7  which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added). The Advisory

8  Committee added this sentence "to make clear at the beginning that summary judgment may be

9  requested not only as to an entire case but also as to a claim, defense, or part of a claim or

10  defense." Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment; *see also Minority

11  Police Officers Ass'n of S. Bend v. City of South Bend*, 721 F.2d 197, 200 (7th Cir. 1983) ("The

12  word 'judgment' in the term 'partial summary judgment' is a misnomer. A partial summary

13  judgment is merely an order deciding one or more issues in advance of trial; it may not be a

14  judgment at all, let alone a final judgment on a separate claim.").

15      Rule 56(a) thus permits a court to grant a motion for partial summary judgment against a

16  "specific theory of damages that [the plaintiff] seeks to pursue at trial." *Stevenson v. Holland*,

17  No. 116CV01831AWIJLT, 2021 WL 4325201, at *1 (E.D. Cal. Sept. 23, 2021). Courts in this

18  circuit regularly grant such motions—even where the relevant claim might survive under an

19  alternative theory. *See, e.g.*, *Farrell v. Home Depot U.S.A., Inc.*, No. 2:19-CV-01402-TLN-AC,

20  2023 WL 5956220, at *4–5 (E.D. Cal. Sept. 13, 2023) (granting partial summary judgment to

21  limit damages on a negligence claim); *Deckers Outdoor Corp. v. Last Brand, Inc.*, No. 23-CV-

22  04850-AMO, 2025 WL 2822685, at *6 (N.D. Cal. Oct. 2, 2025) (precluding the plaintiff "from

23  bringing a lost profits theory of damages for its patent infringement claim"); *Lucas v. MGM

24  Resorts Int'l*, 724 F. Supp. 3d 1142, 1159 (D. Nev. 2024) (granting summary judgment against

"breach-of-fiduciary-prudence and failure-to-monitor claims to the extent that they are based on share-class selection and retention," but ruling that "[t]o the extent [they] are based on excessive recordkeeping expenses, they proceed to trial."). Here, Defendants seek a ruling that Plaintiff's primary theory of liability lacks any evidentiary basis and fails as a matter of law. Dkt. 112 at 3–4. This falls squarely within the range of issues that the Court may consider under Rule 56(a).

Having found Defendants' motion to be procedurally sufficient, the Court considers the merits of the motion.

**B.    Plaintiff's urinalysis theory is medically complex and would require expert testimony at trial.**

Washington courts require expert testimony to establish causation for "complex questions that laypersons would not be able to answer without medical training." *Spence v. Walsh*, 19 Wn. App. 2d 1018, 2021 WL 4432745, at *3 (2021); *see Lo v. United States*, No. 2:17-CV-01202-TL, 2023 WL 2014331, at *18 (W.D. Wash. Feb. 15, 2023) (expert testimony is required where an injury "involves obscure medical factors that would require an ordinary lay person to speculate or conjecture in making a finding" (quoting *Bruns v. PACCAR, Inc.*, 77 Wn. App. 201, 214, 890 P.2d 469 (1995))). Washington courts have rejected the argument that "only medical testimony can show causation" but clarified that "[m]edical causation must be established by a more-likely-than-not standard." *Ma'ele v. Arrington*, 111 Wn. App. 557, 563–64, 45 P.3d 557 (2002)).

On the other hand, "material facts could be within the expertise of a layman when they are observable by the layman's senses and describable without medical training." *Pagnotta v. Beall Trailers of Or., Inc.*, 99 Wn. App. 28, 33, 991 P.2d 728 (2000) (citing *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 227–28, 770 P.2d 182 (1989)).

Defendants argue that Plaintiff's urinalysis theory cannot proceed to trial because she has not disclosed any expert "who links the supplements to [Plaintiff's] positive urinalysis." Dkt. 112

at 14. Defendants compare the complexity of this case to those alleging "that multiple airborne chemicals caused a plaintiff to experience various physical reactions" or that a firefighter's "heart disease was caused by occupational exposures" when he also "had multiple heart problems unrelated to his employment." *Id*. at 13 (internal quotation marks omitted) (quoting *Bruns*, 77 Wn. App at 214–15; *Bolson v. Williams*, 181 Wn. App. 1016, 2014 WL 2211401, at *5 (2014)).

The Court agrees that Plaintiff's urinalysis theory poses similar, medically complex questions. As Defendants' counsel argued at the summary judgment hearing,

> [d]etermining how and what caused [P]laintiff's 4997 nanogram per milliliter alleged result requires at least an understanding of how amphetamine is absorbed, metabolized[,] and eliminated through urine, what dose of amphetamine or Adderall would be required to reach about a 5,000 nanograms per milliliter urine concentration, or whether a capsule the size [P]laintiff might have taken could have physically contained that dosage, [and] how hydration, urine pH, kidney function, and timing of the ingestion affect urine concentration and how to interpret toxicology results.

Dkt. 187 at 39–40. An expert must address these facts, or else "the jury would be left to speculate as to the possible causes" of Plaintiff's urinalysis. *Bolson*, 2014 WL 2211401, at *5.

## C.    Plaintiff did not disclose any experts who address the cause of her positive urinalysis.

Given the medical complexity of her urinalysis theory, Plaintiff cannot proceed to trial on this issue without expert testimony to support causation. Plaintiff has put forth four experts to support her summary judgment response: Steven Dezell, Catherine Okano, Ronald Shippee, and James Kababick. Dkt. 190 at 34; Dkt. 187 at 25, 27, 29. Defendants ask the Court to exclude evidence from each of these experts in its summary judgment ruling because Plaintiff failed to properly disclose them before the December 2, 2025 hearing. Dkt. 194 at 1–2 (citing Fed. R. Civ. P. 37).

1            *1.    Legal standard for excluding expert testimony based on failure to disclose*

2        Under Federal Rule of Civil Procedure 26(a)(2)(B), parties must disclose the identity of

3   each expert witness "accompanied by a written report—prepared and signed by the witness—if

4   the witness is one retained or specially employed to provide expert testimony." If the witness is

5   not required to provide a written report, the disclosure must include "the subject matter on which

6   the witness is expected to present evidence" and "a summary of the facts and opinions to which

7   the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).

8        Federal Rule of Civil Procedure 37(c)(1) "gives teeth" to Rule 26's disclosure

9   requirements, *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir.

10  2001), providing that generally, when a party fails to "provide information or identify a witness

11  as required by Rule 26(a)," that "party is not allowed to use that information or witness to supply

12  evidence on a motion, at a hearing, or at a trial." Fed. R. Civ. P. 37(c)(1). "Rule 37(c)(1) is a

13  'self-executing,' 'automatic' sanction designed to provide a strong inducement for disclosure."

14  *Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) (quoting *Yeti*

15  *by Molly*, 259 F.3d at 1106). Consequently, the Court has broad "discretion to issue sanctions

16  under Rule 37(c)(1)." *Yeti by Molly*, 259 Fed.3d at 1106.

17       Rule 37(c)(1) does not apply, however, where "the failure was substantially justified or is

18  harmless." Fed. R. Civ. P. 37(c)(1); *see also Yeti by Molly*, 259 F.3d at 1106 ("Two express

19  exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the

20  parties' failure to disclose the required information is substantially justified or harmless."). The

21  burden of proving substantial justification or harmlessness is on the party facing sanctions. *Yeti*

22  *by Molly*, 259 F.3d at 1107.

23           *2.    Plaintiff's violations of Rule 26 were not substantially justified or harmless.*

24       Four experts are relevant to the present motion:

- Dr. Steven Dezell is a Lieutenant Colonel in the United States Air Force and forensic toxicology consultant who testified at Plaintiff's court martial. Dkt. 177 at 4–5; Dkt. 190-39. Plaintiff disclosed Dr. Dezell as a non-retained expert on September 22, 2025.[4] Dkt. 177 at 4–5. Plaintiff also designated Dr. Dezell as a rebuttal expert on October 22 and indicated he would opine that Plaintiff's positive urinalysis "more likely than not" resulted from adulteration of Thesis supplements. Dkt. 194-8 at 9.

- Dr. Catherine Okano is an "expert in forensic toxicology" who testified at Plaintiff's court martial. Dkt. 177 at 5–6; Dkt. 190-21. Plaintiff disclosed Dr. Okano as a non-retained expert on September 22, 2025. Dkt. 177 at 5–6.

- Mr. James Kababick is the Director at Flora Research Laboratories and "an expert in phytochemistry and supplement/ingredient testing." *Id*. at 202–03. Plaintiff disclosed Mr. Kababick as a rebuttal witness to discuss "the lack of consistency across supplement product manufacture[rs] and the lack of chain of custody" and produced his report on October 22, 2025. *Id*. at 202–206. Plaintiff then provided a supplemental report from Mr. Kababick on December 1, after he had already been deposed on November 7. Dkt. 196-2; Dkt. 187 at 44–45.

- Dr. Ronald Shippee is a retired Army officer and forensic toxicologist. Dkt. 196-1 at 122–33. Plaintiff disclosed Dr. Shippee and produced his report on November 12, 2025. Dkt. 197 at 10. Plaintiff intends for Dr. Shippee to replace Dr. Dezell after the Air Force denied Dr. Dezell's request to serve as an expert in this case. Dkt. 187 at 22, 26.

Defendants ask the Court to exclude each of the above from the summary judgment record and the case at large. Dkt. 194 at 1. Defendants argue that each expert or report was either (1) disclosed after the expert disclosure deadline or (2) improperly disclosed as a non-retained expert for whom a report is not required under Rule 26(a)(2)(C). *Id*. at 2–9; *see Cantu v. United States*, No. CV1400219MMMJCGX, 2015 WL 12743881, at *5 (C.D. Cal. Apr. 6, 2015). ("[T]he critical distinction between retained and non-retained experts is the nature of the testimony the expert will provide, and whether it is based only on percipient knowledge or on information reviewed in anticipation [of] trial.").

---

[4] The parties were required to disclose affirmative experts by September 22 and rebuttal experts by October 22, 2025. Dkt. 37.

Instead of contesting these arguments, Plaintiff argues that her tardy disclosures should be permitted because they were substantially justified or harmless. Dkt. 197 at 13–16. Specifically, she claims that (1) the Air Force unexpectedly prohibited Dr. Dezell from serving as an expert; (2) the experts who were disclosed late have similar testimony and reports to those who were disclosed before the deadline; and (3) Defendants were not unfairly surprised by any of the late disclosures. *Id.*; Dkt. 187 at 22. A review of the record undermines each claim.

First, Plaintiff was aware that Dr. Dezell would likely not be available to testify. Plaintiff contacted Dr. Dezell on August 30, 2024, and he agreed to assist as an expert. Dkt. 196-1 at 13–15. On May 2, 2025, Dr. Dezell obtained a memorandum from a judge advocate recommending that his request for off-duty employment ("ODE") be approved. *Id.* at 20–21. Plaintiff submitted a *Touhy* request[5] to the Air Force for Dr. Dezell's testimony on September 12, 2025. *Id.* at 47. Plaintiff disclosed Dr. Dezell "as a rebuttal expert regarding amphetamine degradation and causation" on October 22, 2025, the rebuttal expert deadline. Dkt. 197 at 8 (citing Dkt. 177 at 195–202). On October 24, 2025, the Air Force denied Dr. Dezell's participation "[i]n accordance with DoDI 5405.02 (*Touhy* Regulation) and AFI 51-301 (Civil Litigation)." Dkt. 196-1 at 55.

The Air Force's denial of Dr. Dezell's testimony was predictable. Defendants raised the issue of *Touhy* approval multiple times, including as early as July 9, 2025. Dkt. 121-1 at 220–21; *see* Dkt. 194-3 at 2–3 (August 22, 2025 email asking "have you received formal *Touhy* approval for individuals who are current/former military and that you've listed as testifying witnesses? We

---

[5] Named after *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), *Touhy* regulations "recognize the authority of agency heads to restrict testimony of their subordinates." *Bobreski v. EPA*, 284 F. Supp. 2d 67, 73 (D.D.C. 2003) (citation modified) (quoting *Alexander v. F.B.I.*, 186 F.R.D. 66, 69 (D.D.C. 1998)). Although the Ninth Circuit has not found *Touhy* regulations to be an independent bar to admissibility, *see Gordon v. United States*, No. C20-0980-JCC, 2021 WL 3472376, at *1 (W.D. Wash. Aug. 6, 2021), an agency's denial may nevertheless influence a witness's decision to testify.

ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 16

informed you a few weeks ago that we have received no approvals and have been told there are none. You said you were going to seek approval. Please update us."). In one email, Defendants cited the very same regulations (Air Force Instruction 51-301 and DoD Instruction 5405.02) the Air Force would ultimately cite in its denial of Dr. Dezell's testimony. Dkt. 194-10 at 3. On September 4, 2025, Dr. Dezell told Plaintiff that he learned his consultation "exceeded" his ODE agreement and that he could only "consult in the background and not testify verbally in person or via written statements." Dkt. 196-1 at 41. Plaintiff still sought *Touhy* approval on September 12, 2025, over a year after she initially contacted Dr. Dezell. *Id.* at 47. While Plaintiff is correct that the Air Force's denial came "beyond the eleventh hour," Dkt. 187 at 22, this was a predictable result of her own delay.

Second, Plaintiff primarily relies on the report of Dr. Shippee and supplemental report of Mr. Kababick to address causality in her urinalysis theory. *See id.* at 27 ("I understand the Court's concern. Dr. Shippee and Mr. Kababick get us there."). But neither report was disclosed before the deadline.

Plaintiff argues that Dr. Shippee's report "replace[d]" Dr. Dezell's. *Id.* at 22. Plaintiff's position appears to be that the disclosure of Dr. Shippee's report "satisf[ied] the expert disclosure deadline of September 22" because Dr. Shippee came to similar conclusions as Dr. Dezell. *Id.* at 29. Even ignoring that Dr. Dezell did not submit his own report (because Plaintiff designated him as a non-retained witness) and was only disclosed as a rebuttal witness who would speak to causation on October 22, not September 22, this argument fails. Permitting an untimely expert to simply "replace" another expert after the conclusion of summary judgment briefing would prejudice Defendants and allow an end run around expert disclosure requirements. As Defendants note, "[t]esting expert evidence involves more than knowing the expert's ultimate conclusion; it requires knowing the expert's credentials, information sources, and methodology.

It often requires a deposition." Dkt. 194 at 8 (citing *Qualey v. Pierce County*, No. 3:23-cv-05679-TMC, 2025 WL 254810, at *3 (W.D. Wash. Jan. 21, 2025) (Rule 26(a)(2)'s expert disclosure requirements serve "to eliminate surprise and provide the opposing party with enough information regarding the expert's opinions and methodology to prepare efficiently.")).

Similarly, Plaintiff attempts to rely on a 41-day-late "supplemental" report from Mr. Kababick which quintupled the length of his original report and added a conclusion that Thesis supplements "more likely than not" contained amphetamines. *Compare* Dkt. 196-2, *with* Dkt. 177 at 204–06. Plaintiff only provided this report after Mr. Kababick testified in a deposition that his opinion was limited to rebutting Defendants' testing at Alkemist Labs. Dkt. 177 at 388–89. Allowing Mr. Kababick's supplemental opinion into the record would deprive Defendants of any opportunity to question him or obtain other discovery regarding his new opinions.

Third, Plaintiff's delay was not harmless. A keystone of Defendants' motion for summary judgment—filed over four months ago—was that Plaintiff's urinalysis theory fails because she "has no expert who links the supplements to her positive urinalysis." Dkt. 112 at 14. Plaintiff did not address this argument in her responsive brief filed October 17, 2025, well after the main expert disclosure deadline of September 22. Dkt. 159. Plaintiff did not request a further extension of any discovery or briefing deadlines. *See* Dkt. 187 at 22–23. Plaintiff did not notify the Court (or Defendants) that she planned to rely on late-disclosed expert testimony until the hearing on December 2, 2025, over a month after briefing on the summary judgment motion concluded. Dkt. 187 at 21, 25, 29. When asked why she hadn't moved for an extension, Plaintiff's counsel replied that she originally "belie[ved] that [she] would be able to prevail absent it." *Id.* at 23.

Plaintiff's failure to follow Rule 26 has already necessitated a deadline extension, additional briefing, and a delay of this order. *Id.* at 49. Allowing the late expert evidence would also let Plaintiff paper over the weaknesses in her case—such as Mr. Kababick's deposition testimony narrowing the scope of his opinion—and prevent Defendants from conducting their own discovery to rebut the evidence. On the other hand, extending the case schedule would necessitate further summary judgment briefing, delay the trial date, and balloon the already-expansive discovery in this case. Either option is an unacceptable burden to impose on Defendants, especially where they foresaw the looming discovery issues and frequently communicated their concerns to Plaintiff.

Finally, Defendants argue that Dr. Okano—like Dr. Dezell—was both improperly disclosed as a non-retained expert and was not expected by Plaintiff to testify. *See* Dkt. 194 at 3 ("Okano has no personal knowledge of [Plaintiff's] urinalysis and could only testify based 'on information reviewed in anticipation for trial'") (first citing Dkt. 190-21 at 29; and then quoting *Fed. Trade Comm'n v. Amazon.com, Inc.*, No. 2:23-CV-00932-JHC, 2025 WL 2460658, at *4 (W.D. Wash. Aug. 26, 2025)); *id.* at 4–5 (Dr. Okano sent texts to Defense counsel on October 27, 2025 stating that Plaintiff "called to see if [Dr. Okano's] phone number was current" but that Dr. Okano "had no other communications from her about the case" (citing Dkt. 194-4 at 2)).

Plaintiff largely fails to respond to either argument, indicating only that she first contacted Dr. Okano on October 28, 2025, over a month after she disclosed Dr. Okano as a non-retained expert. Dkt. 197 at 9. Although Dr. Okano has now told Plaintiff that she would be available for the trial date in April 2026, Dkt. 196-3 at 20, the Court agrees with Defendants that Plaintiff still "provides no good-faith basis" for her belief that Dr. Okano's opinion would be based on percipient knowledge and thus require no expert report. Dkt. 201 at 3. Plaintiff's failure

to disclose any report from Dr. Okano is harmful for the same reasons as her other errors discussed above.

Plaintiff has failed to show that her late disclosures were substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). The Court therefore GRANTS IN PART[6] Defendants' motion to exclude and strike expert evidence. Dkt. 194. Expert evidence provided by Drs. Dezell, Okano, and Shippee, along with Mr. Kababick's second report, is STRICKEN from the record.

       3.       *Without any relevant expert, Plaintiff's urinalysis theory cannot proceed to trial.*

Because Plaintiff advances a medically complex theory that Thesis supplements caused her urinalysis, she requires expert testimony on that issue to survive summary judgment. *See supra* Section IV.B. Having excluded the expert evidence discussed above, the Court finds that no remaining experts address whether Thesis supplements caused Plaintiff's positive urinalysis. Mr. Kababick's first opinion, which comes closest to doing so, opines only that Defendants' Alkemist Labs test does not "represent[] definitive proof" of a lack of adulteration and "there is no way to know that the products she ingested were not adulterated." Dkt. 177 at 205. But it is Plaintiff who bears the burden of proof at trial, and at summary judgment she must show evidence from which a reasonable jury could find that burden met. To support causation, expert testimony must demonstrate that a defendant's conduct "probably" or "more likely than not" caused the injury, rather than "might have," "could have," or "possibly did." *Bolson*, 2014 WL 2211401, at *6 (internal quotation marks omitted) (quoting *Fabrique v. Choice Hotels Int'l, Inc.*, 144 Wn. App. 675, 687, 183 P.3d 1118 (2008)); *Rathod v. United States*, No. 22-36045,

---

[6] Defendants also maintain that the Court should strike Mr. Kababick's first report because it contains citations which were "hallucinated" by generative artificial intelligence. Dkt. 194 at 14. Defendants claim there are similar hallucinations in Plaintiff's response to their motion to strike, *Daubert* motion, and proposed amended complaint. Dkt. 201 at 1–3; Dkt. 198. The Court will address these arguments in a separate order but finds, as discussed below, that partial summary judgment is appropriate even if Mr. Kababick's first opinion remains in the record.

2023 WL 8710550, at *1 (9th Cir. Dec. 18, 2023) ("Summary judgment is appropriate where a plaintiff's expert fails to identify specific facts in support of a causation analysis.").

Mr. Kababick's original opinion falls short of that standard. Thus, summary judgment foreclosing Plaintiff's urinalysis theory is appropriate.

**D.    No material dispute of facts exists as to Plaintiff's urinalysis theory.**

Even if this Court could consider Plaintiff's urinalysis theory without any expert evidence, it would not survive summary judgment. Viewed in the light most favorable to Plaintiff, the available evidence supports no more than a speculative chance that Plaintiff's positive urinalysis was caused by amphetamines in Thesis supplements.

After she tested positive, Plaintiff tested her own samples of Thesis supplements, and Defendants tested a sample from each batch that could have been sold to Plaintiff. Dkt. 113-1 at 14–15, 128–29, 150–51, 162, 175–95. In both tests, all four types of supplements tested negative for amphetamines. *Id*. at 128–29, 162, 175–95. Brand requires that its vendors submit certificates of analysis with identity tests, and no relevant ingredient purports to contain amphetamines. *Id.* at 21–22, 30–116. Brand is also certified by NSF International, the same organization to which Plaintiff sent her supplements for testing. *Id.* at 118–20. The certification is part of a "good manufacturing practices registration program" that requires Brand to meet certain standards of training, cleanliness, and recordkeeping, and be subject to a yearly inspection and audit. *Id.* at 130–32. The certification requires the manufacturer to sign an affidavit that they do not produce or purchase any substances "on the NSF 306 list," including amphetamines. *Id.* at 132–33. Moreover, Plaintiff tested positive for Adderall's proprietary three-to-one ratio of D-amphetamines to L-amphetamines. Dkt. 113-1 at 226. Plaintiff has not shown that any amphetamines, let alone Adderall, ever made their way into any Thesis or Brand product.

1    In her responsive brief, Plaintiff cites scattershot evidence that could not support a

2  finding of adulteration. Dkt. 190 at 34–35. Although Plaintiff continues to ignore the Court's

3  requests to cite to specific pages or line numbers in the record, Dkt. 182 at 9 n.4, Dkt. 187 at 36–

4  37, the Court has puzzled together the pieces of Plaintiff's cited exhibits that best support her

5  argument. Plaintiff provides evidence showing the following:

6    • Plaintiff purchased and ingested Thesis supplements before testing positive and
      stopped after testing positive. Dkt. 190-50 at 2–3, 5–10; Dkt. 190-30 at 47.

7
8    • Plaintiff tested positive only once in her military career, on August 16, 2021,
      and tested negative after discontinuing her use of Thesis supplements. Dkt. 190-
      28 at 63, 179; Dkt. 190-47 at 5.

9
10   • Neither Thesis nor Brand screen the ingredients in Thesis supplements for
      amphetamines. Dkt. 190-54 at 19.

11   • In 2023, Brand received a warning letter from the Food and Drug
      Administration ("FDA") following an audit of its facilities. Dkt. 190-55. The

12    FDA found Brand failed to (1) analytically test its finished products; (2) verify
      the identity of dietary ingredients and test new dietary ingredients when they

13    are received; (3) reject an ingredient that did not meet Brand's specifications;
      (4) establish a protocol for verifying the identity of a new dietary ingredient;

14    and (5) properly calibrate an optical reader on a testing instrument. *Id*. at 3–5.

15   • Freed has been prescribed Adderall two times and "probably got it from a friend
      with a prescription" at some point during his life. Dkt. 190-63 at 12.

16
17   • Thesis received up to three "[q]uestions about" whether its products may have
      caused a positive drug test, but "none of those . . . became a formal complaint."
      *Id*. at 21.

18    No jury could reasonably conclude from this evidence that Thesis supplements caused

19  Plaintiff's positive urinalysis. When considering the other untested medications Plaintiff

20  ingested, Dkt. 113-1 at 27, 141–42, the chance of a mistake in testing Plaintiff's urine sample, or

21  the chance that Plaintiff could have ingested Adderall itself, a jury would ultimately be "left to

22  speculate" as to the true culprit. *Mendez Jimenez v. County of Sacramento*, No.

23  218CV00044JAMKJN, 2019 WL 5862909, at *2 (E.D. Cal. Nov. 8, 2019). "[Plaintiff's]

24

speculation does not create a factual dispute." *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995). Thus, even if Plaintiff was not required to provide a relevant expert, her urinalysis theory fails because there is no material dispute of fact as to whether Thesis supplements caused her to test positive.[7]

## V.    CONCLUSION

The Court GRANTS IN PART Defendants' motion to exclude and strike Plaintiff's expert evidence. Dkt. 194. Expert evidence provided by Drs. Dezell, Okano, and Shippee, along with Mr. Kababick's second report, is STRICKEN from the record and may not be used "to supply evidence on a motion, at a hearing, or at trial." Fed. R. Civ. P. 37(c)(1).

The Court GRANTS IN PART Defendants' motion for partial summary judgment. Dkt. 112. Plaintiff's claims are DISMISSED WITH PREJUDICE to the extent they (1) rely on allegations of amphetamine adulteration and (2) claim damages caused by Plaintiff's positive test for amphetamines. Defendants' motion for partial summary judgment is DENIED IN PART with respect to the argument that Plaintiff's CPA claim is not legally cognizable, for the reasons previously explained in the Court's order on Defendants' motion to dismiss. *See* Dkt. 169. As with all of Plaintiffs' claims, however, the CPA claim is barred to the extent it relies on allegations of amphetamine adulteration.

---

[7] Defendants also argue that a positive urinalysis could not have affected Plaintiff's promotion because the Army's Promotion Board already determined they would not promote Plaintiff when they met in April and May of 2021, months before her positive urinalysis. Dkt. 112 at 6 (citing Dkt. 113-1 at 287). Although Plaintiff provides some evidence to contest this fact, *see* Dkt. 190-53 at 6, the Court need not address the issue here because it has already determined that summary judgment is appropriate.

Dated this 9th day of January, 2026.

Tiffany M. Cartwright
United States District Judge