# Exhibit A

**Expert Report of Evelyn D. Cadman**

I, Evelyn D. Cadman, have been retained by counsel for Plaintiff JoAnn LeDoux in the matter pending before the United States District Court for the Western District of Washington. I have been asked to render expert opinions regarding the regulatory status of the dietary supplement product sold to MAJ JoAnn LeDoux by the defendants in this matter. I have not been asked to render a toxicological or forensic identification opinion concerning the specific chemical composition of the substance that triggered MAJ LeDoux's urinalysis results, and I express no opinion on that subject.

I am a scientific and regulatory consultant with more than 25 years of experience in FDA-regulated industries. I am the founder of FDA Compliance Simplified, a service of Cadman Consulting Services, LLC, and I have advised clients worldwide on U.S. regulatory matters related to dietary supplements, foods, cosmetics, and over-the-counter drugs. My work includes evaluating product formulations for compliance with FDA requirements, preparing FDA submissions, reviewing labeling and marketing materials, and analyzing regulatory risk. My background includes work in academic neuroscience, pharmacology, product development, and regulatory strategy. Further details about my experience and qualifications are set forth in **Attachment A**, my curriculum vitae. I am being paid for my time and expertise consistent with my standard fee schedule, found at **Attachment B**. If I have testified in trials or depositions over the last four years, they are reflected in **Attachment C**.

The matters I have considered are listed in **Attachment D**, which include batch reports, certificates of analyses, correspondence between Thesis and Brand Nutra and their suppliers and among themselves, the FDA Warning Letter issued to Brand in March 2023, and Brands written response, product labeling and advertising materials, website representations, consumer-facing promotional claims, Defendants' responses to discovery requests, including their most recent responses that they cannot tell what ingredients were in the products sold to Plaintiff LeDoux, and publicly available FDA guidance regarding dietary supplements and new dietary ingredient notifications. I have also reviewed scientific and regulatory literature regarding adulteration, quality control, and the safety of new dietary ingredients, as well as relevant industry standards under 21 C.F.R. Part 111 (Current Good Manufacturing Practices). These materials, taken together, provide a sufficient factual foundation for my opinions and are the same types of sources reasonably relied upon by experts in regulatory affairs and FDA compliance. My review and methodology are consistent with the principles of sound regulatory analysis: gathering relevant data, comparing it to established federal standards, and applying that framework reliably to the facts of this case.

In my opinion, the product sold to MAJ LeDoux was adulterated as that term is defined in 21 U.S.C. § 342(a)(1) and (a)(2)(C), and under the implementing regulations at 21 C.F.R. Part 111 and 21 C.F.R. § 190.6. It contained one or more substances that

qualify as new dietary ingredients for which the required 75-day premarket notification under 21 U.S.C. § 350b and 21 C.F.R. § 190.6 was not filed. These substances have not been shown to be safe under the conditions of use recommended or suggested in the labeling. Moreover, certain ingredients in the product have pharmacological effects and are not appropriately classified as dietary ingredients under 21 U.S.C. § 321(f) and 21 C.F.R. § § 101.36 and 190.10. The inclusion of such substances renders the product adulterated. I also reviewed correspondence by an employee/officer of Thesis who was trying to procure ingredients that were not permitted for inclusion in supplements and other companies reported to Thesis that they could not manufacture with those ingredients because they were either "banned" or due to their "classification.". From discovery one or more of those ingredients were later purchased by Thesis from Chinese companies in complete disregard of U.S. regulations.

In my opinion, the product at issue contained one or more substances that fall outside the definition of a dietary ingredient and instead meet the definition of a "drug" under 21 U.S.C. § 321(g)(1), as further clarified in the regulations at 21 C.F.R. § 201.128 (intended uses) and 21 C.F.R. § 310.3 (new drugs). According to the FDA, a substance is a drug if it is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" or if it is "intended to affect the structure or any function of the body" and is not generally recognized as safe and effective for such use. Certain stimulant compounds previously identified in the nootropic products manufactured and sold by the Defendants — such as 1,3-dimethylamylamine (DMAA) and vinpocetine — have been the subject of FDA warning letters and regulatory findings. The FDA has concluded that such compounds are not lawful dietary ingredients, are not approved drugs, and in some cases have no recognized medical use in the United States, rendering their presence in supplements unlawful. These substances are often included for their pharmacological effects, which further supports a finding that the product was adulterated and misbranded.

For example, the ingredient Zembrin, a proprietary extract of *Sceletium tortuosum*, was included in certain Thesis-branded formulas. The FDA has expressly stated that a company's proposed use of Zembrin in a dietary supplement was not justified under the law, because of "insufficient verification of safety for human consumption." This finding was published in connection with the agency's review of an NDI notification for Zembrin. In declining to accept the notification, the FDA concluded that the submitter had not provided adequate basis to conclude that Zembrin is reasonably expected to be safe under the recommended conditions of use.

Accordingly, Zembrin's inclusion in a dietary supplement — absent an accepted NDI notification or exemption — renders the product adulterated under 21 U.S.C. § 342(f)(1)(B). This aligns with the opinion that the Thesis product consumed by MAJ LeDoux was unlawfully marketed and did not conform to the requirements for lawful sale.

Additionally, I found that the labeling and marketing of the product included impermissible disease and therapeutic claims. These claims represented the supplement as an alternative to prescription medications, used terms like "Adderall," and suggested treatment of conditions such as ADHD, fatigue, or anxiety. These types of representations exceed what is permitted for dietary supplements and render the product misbranded under federal law. In my opinion, the product packaging and labeling for the Thesis supplement sold to MAJ JoAnn LeDoux failed to meet the requirements of the Food, Drug, and Cosmetic Act and associated FDA regulations concerning adequate warnings and disclosures. The packaging did not provide a complete and transparent disclosure of all active ingredients or their sources and failed to include language sufficient to inform consumers of potential risks, interactions, or contraindications. In particular, the label omitted any reference to the inclusion of substances that may function as **central nervous system stimulants** or other pharmacologically active compounds. Additionally, the product was marketed as **safe for cognitive enhancement**, including to individuals with high-performance demands, without any adequate substantiation or required disclaimers. The packaging lacked the **"not evaluated by the FDA"** disclaimer required under 21 CFR § 101.93(c) for structure/function claims and included representations that suggested disease-related benefits (e.g., treatment of fatigue, ADHD, or anxiety), which are expressly prohibited for dietary supplements.

Moreover, the packaging did not include directions for safe use, warning language, or adverse event contact information, as is required under DSHEA and FDA guidance. The failure to include warnings about the inclusion of unapproved new dietary ingredients or the risk of contamination with pharmacologically active substances further rendered the product misbranded and unsafe for use as labeled. Based on my review, the labeling and packaging not only failed to comply with FDA regulations but also materially contributed to the regulatory conclusion that the product was **adulterated and misbranded**, and failed to provide consumers — including MAJ LeDoux — with the information necessary to make an informed decision about product safety and use.

It is also my opinion that the Defendants' manufacturing and quality control procedures, including their handling of batch records and testing protocols, were not consistent with Current Good Manufacturing Practices (cGMPs) as codified in 21 C.F.R. Part 111. Among other requirements, dietary supplement manufacturers must maintain complete and accurate batch production records that document each significant step in the manufacturing, packaging, labeling, and holding of a dietary supplement (21 C.F.R. §§ 111.255, 111.260). These records must identify each component, its lot number, the quantity used, verification by quality control personnel, and the results of any testing performed. They also must conduct identity testing of each dietary ingredient received to confirm it matches its specification, unless an exemption applies (21 C.F.R. § 111.75). Additionally, to comport with cGMPs, they must establish and follow written procedures for quality control operations to ensure the product meets identity, purity,

strength, and composition requirements (21 C.F.R. §§ 111.103–111.127). They also must investigate and document deviations and product complaints to determine whether corrective action is required (21 C.F.R. §§ 111.535–111.570).

Based on the discovery I reviewed, Defendants' records and practices did not conform to these standards. For example, batch records produced by Defendants contained gaps, lacked consistent verification by quality control personnel, and did not reliably trace ingredient lots back to their suppliers. Certificates of analysis (COAs) were incomplete or missing, and in some instances the same COA appeared to have been reused for multiple batches rather than reflecting actual testing of the batch at issue. Correspondence also indicated attempts to source ingredients outside of normal supply chains, without corresponding documentation of identity testing as required by 21 C.F.R. § 111.75. I also observed in correspondence a decision by Thesis to cease labeling with lot and batch numbers and to discontinue labeling with expiration dates. Most notably, the recent response to requests for admission stated that Defendants are unable to tell what ingredients were in the products sold to Major LeDoux. These deficiencies are inconsistent with cGMPs and materially undermine the reliability of the Defendants' manufacturing and quality control system.

From records that I reviewed, I also found inconsistencies in the composition and potency of the Thesis products, including discrepancies in the identity and concentration of active ingredients across different batches or formulas. 21 C.F.R. Part 111 (Dietary Supplement cGMPs) sets the standards for identity, purity, strength, and composition. The key is that cGMPs do not allow any unexplained deviation in these attributes — the manufacturer must ensure the product matches its specifications every time. Under 21 C.F.R. § 111.70(a), strength means the concentration of an active ingredient. If testing shows a batch does not meet its established strength specification (too low, too high, or inconsistent across capsules), the batch fails cGMP. Even modest variances (e.g., 10–20%) can trigger noncompliance unless specifically justified and documented. Additionally, under 21 C.F.R. § 111.75(a), every dietary ingredient must be verified to ensure it is what it purports to be. If a batch contains an undeclared stimulant (e.g., BMPEA, DMAA) or if an expected ingredient is absent or substituted, that is a per se failure of cGMP — it goes to the core of "identity." If even an ingredient is adulterated, contaminated, or substituted (e.g., mislabeled raw materials, residual solvents, or cross-contamination during production), this constitutes a cGMP violation regardless of the size of the deviation. Manufacturers must set and adhere to scientifically valid test methods and specifications (21 C.F.R. §§ 111.75(h), 111.320). "Discrepancies" are measured against those specifications. For example, if a label claims 200 mg of a nootropic ingredient but batch testing shows 140 mg, that's a 30% shortfall, which is a material variance. If one batch contains an ingredient absent from another, that's a composition inconsistency and violates 21 C.F.R. § 111.70(a)(4). Even minor deviations must be investigated and justified under 21 C.F.R. § 111.83 — otherwise the product is deemed adulterated. In correspondence I reviewed in this case, an

employee/officer of Thesis seemed to be negotiating with the manufacturer about a strategy to render their measurements consistent with their supplier's. Under GMP standards, a manufacturer must prove that each lot consistently meets its specifications. Unexplained inconsistencies in composition or potency are serious because they undermine both product safety and label accuracy.

From the records I reviewed, I also found inconsistencies in the composition and potency of the Thesis products. Under 21 C.F.R. Part 111, dietary supplement manufacturers are required to establish specifications for the identity, purity, strength, and composition of their products and to verify that each batch meets those specifications. Deviations from these specifications, even if modest, must be scientifically justified and documented. Where strength is concerned, variances in the concentration of an active ingredient that depart from the established specification render the batch noncompliant unless adequately explained and corrected. Likewise, where the identity of an ingredient is inconsistent across batches, or where an ingredient appears in one batch and not in another, the product fails to meet the basic cGMP requirement that each lot conform to its labeled composition. In this case, the batch records and related testing protocols I reviewed revealed discrepancies in the concentration of active ingredients and incomplete documentation of ingredient identity testing. These deficiencies are inconsistent with cGMP requirements and support my opinion that the products at issue were adulterated under 21 U.S.C. § 342(g)(1) and 21 C.F.R. §§ 111.70(a), 111.75(a), 111.83.

Specifically, a product is deemed adulterated if it has been prepared, packed, or held under conditions that do not meet cGMP standards. Inconsistent potency or varying ingredient profiles — particularly where labeling and marketing imply a uniform formula — expose consumers to unknown risks and violate the FDA's mandate that supplement manufacturers ensure their products are not misleading, contaminated, or substandard. In this case, the variability in formulation undermines any assurance of safety or efficacy, further supporting the conclusion that the product sold to MAJ LeDoux was not manufactured in compliance with federal law.

My conclusions are rendered to a reasonable degree of scientific certainty and are based on my training and experience in FDA regulatory affairs and my review of the materials referenced herein. I reserve the right to amend or supplement this report upon review of additional documents or discovery in this matter.

Executed this 22nd day of September 2025.

Evelyn Cadman

**FDA COMPLIANCE SIMPLIFIED**

Digitally signed by Evelyn Cadman
Date: 2025.09.22 19:24:43 -06'00'

# Attachment A

EVELYN D. CADMAN
9172 West 92nd Avenue
Westminster, CO  80021
303-432-1605
ECadman@FDASimplified.com

EXPERTISE
Regulatory compliance for wide range of FDA-regulated products
Research and consumer health product development
Nutritional evaluation of food product lines

PROFESSIONAL EXPERIENCE
FDA Compliance Simplified (www.FDASimplified.com), a service of Cadman Consulting Services, LLC; Westminster, CO
2001 - Present
Scientific & Regulatory Consultant—FDA regulatory affairs services including labeling / marketing reviews and submissions relevant to foods, dietary supplements, cosmetics, OTC drugs and medical devices. Technology reviews for patent potential and consumer product applications. Research and report preparation support.

Boston Market Corporation, Golden, CO
Concurrent with present position June 2005 to September 2007
Nutrition & Labeling Manager— Managed food product labeling process to ensure compliance with FDA, USDA and FTC regulations. Reviewed global regulatory status and consumer perception of proposed food product ingredients. Assisted marketing with program development and menu labeling requirements.

NBTY, Inc., Northglenn, CO
Concurrent with present position April 2002 through November 2004
Nutrition Researcher— Reviewed new products for safety and regulatory compliance. Reviewed literature for claim and safety data. Served as FDA, FTC liaison.

University of Colorado Health Sciences Center, Division of Cancer Prevention & Control.
Concurrent with present position Q1 2002
Professional Research Assistant (temporary contract) for SHINE Women's Health Study—Recruited study participants and assisted lead researchers with case control study of breast cancer.

NatureSmart, a subsidiary of Whole Foods Market, Inc., Thornton, CO
1997 - 2001
Senior Research Scientist (January 1999); Research and Development—Responsible for coordination of research efforts for the corporation's largest direct marketing division including new product formulation, literature research and reporting on nutritional supplements for new and existing products.  Managed research efforts of two staff scientists.  Additional responsibilities included providing technical assistance for review of patents and FDA regulations, design of in-house efficacy studies and coordination of committee to streamline the new product development process.
Research Scientist (January 1998);  Research and Development—Responsible for coordination of research efforts for the corporation's largest direct marketing division including new product formulation, literature research and reporting on nutritional supplements for new and existing products.
Research Specialist (June 1997 - January 1998); Research and Development—Responsible for new product formulation, literature research and reporting on nutritional supplements for new and existing products.

Abbott Laboratories, Abbott Park, IL
1986 - 1996
Pharmacologist; Neuroscience Area, Pharmaceutical Products Division 1990 - 1996
Developed assays and conducted research aimed at hypothesis testing for Alzheimer's Disease projects. Responsible for experimental design, analysis, interpretation and presentation of data in lecture and manuscript formats. Performed literature searches using various computer databases. Coordinated research of summer interns.
Pharmacology Research Associate II  1986 - 1990
Developed functional assays to assess potential pharmacologic agents for Neuroscience drug discovery projects. Assisted development of COGF Oracle database. Developed and presented COGF database training course. Administered COGF database for cognitive function project. Served on divisional safety committee.

EDUCATION
Bachelor of Science in Biophysical Sciences. University of Houston, Texas, May 1980
    Summa cum laude
    University Honors, Thesis: Purification and characterization of a phospholipase A activity from *Alteromonas espejiana*.
Certified Nutritionist (CN). American Health Science University, Denver, Colorado, May 1999

MEMBERSHIPS
Rocky Mountain Regulatory Affairs Society

PUBLICATIONS
1. Evelyn Cadman, Cosmetics in *Fundamentals of US Regulatory Affairs ,8th Edition.* 2013.
2. Evelyn Cadman, Nutritional Genomics and the Future of Food Labeling in *Nutritional Genomics: The Impact of Dietary Regulation of Gene Function on Human Disease,* Edited by Wayne R. Bidlack and Raymond L. Rodriguez, CRC Press, 2011.
3. Evelyn Cadman, Cosmetics in *Fundamentals of US Regulatory Affairs ,7th Edition.* 2011.
4. Maruthi Prasad Palthu and Evelyn Cadman, Dietary Supplements and Homeopathic Products in *Fundamentals of US Regulatory Affairs ,7th Edition.* July 2011.
5. Evelyn Cadman (ed.) Food Products in *Fundamentals of US Regulatory Affairs ,7th Edition.* July 2011.
6. Kraska, RC., Cadman, ED., McQuate, RS., (2010) Stevia-Derived Sweeteners: Safety, Regulatory & Labeling Considerations, Stevia World Americas, Atlanta, GA.
7. Evelyn Cadman, Cosmetics in *Fundamentals of US Regulatory Affairs ,6th Edition.* August 2009.
8. Maruthi Prasad Palthu and Evelyn Cadman, Dietary Supplements and Homeopathic Products in *Fundamentals of US Regulatory Affairs ,6th Edition.* August 2009.
9. Cadman, E.D. and Puttfarcken, P.S., (1997), β-amyloid peptides initiate the complement cascade without producing a comparable effect on the terminal pathway in vitro, Experimental Neurology 146:388-394.
10. Manelli, A.M., Cadman, E.D., Shiosaki, K. and P.S. Puttfarcken, (1997), The presence of the complement cascade does not lead to neuronal cell death in primary hippocampal cultures, Brain Research Bulletin 42(3):187-193.
11. Cadman, E.D., Naugles, D. D. and C.M. Lee, (1994), Cyclic AMP is not involved in Interleukin-1 induced Interleukin-6 Release from Human Astrocytoma Cells, Neuroscience Letters 178(N2):251-254.
12. Cadman, E.D., Witte, D.G. and C.M. Lee, (1994), Regulation of the release of Interleukin-6 from human astrocytoma cells, Journal of Neurochemistry 63:980-987.
13.  Arneric', S.P., Sullivan, J.P., Briggs, C.A., Donnelly-Roberts, D., Anderson, D.J., Raszkiewicz, J.L., Hughes, M.L., Cadman, E.D., Adams, P., Garvey, D.S., Wasicak, J.T., and M. Williams, (1994),  (S)-3-Methyl-5-(1-methyl-2-pyrrolidinyl) isoxazole (ABT-418)- A Novel Cholinergic Ligand with Cognition-

Enhancing and Anxiolytic Activities. 1.In-vitro Characterization, Journal of Pharmacology and Experimental Therapeutics 270 (N1):310-318.

14. Garvey, D.S., Wasicak, J.T., Elliott, R.L., Lebold, S.A., Hettinger, A.-M., Carrrera, G.M., Lin, N.-H., He, Y., Holladay, M.W., Anderson, D.J., Cadman, E.D., Raszkiewicz, J.L., Sullivan, J.P. and S.P. Arneric', (1994), Ligands for brain cholinergic channel receptors:  Synthesis and in vitro characterization of novel isoxazoles and isothiazoles as bioisosteric replacements for the pyridine ring in nicotine, Journal of Medicinal Chemistry 37 (26):4455-4463.

15. Decker, M.W., Majchrzak, M.J., Cadman, E.D., and S.P. Arneric', (1994),  Effects of Chlorisondamine on Nicotinic Receptor Binding in Whole Brain and Nicotine-Induced Changes in Locomotor Activity in Rats, Drug Development Research 31:89-94.

16. Garvey, D.S., Wasicak, J.T., Chung, J.Y.-L., Shue, Y.-K., Carrera, G.M., May, P.D., McKinney, M.M., Anderson, D., Cadman, E., Vella-Rountree, L., Nadzan, A.M., and M. Williams, (1992), Synthesis and in Vitro Characterization of Novel Amino Terminally Modified Oxotremorine Derivatives for Brain Muscarinic Receptors, Journal of Medicinal Chemistry 35:1550-1557.

17. Anderson, D.J., Decker, M.W., Arneric', S.P., Cadman, E., Buckley, M.J., Vella-Rountree, L., and M. Williams, (1991), Aminopyridazine Muscarinic Agonist, SR 95639A, Is a Functional M2 Receptor Antagonist in Rat Brain, Drug Development Research 24:107-118.

18. Vickroy, T.W., and E.D. Cadman, (1989), Dissociation between Muscarinic Receptor-Mediated Inhibition of Adenylate Cyclase and Autoreceptor Inhibition of [3H]Acetylcholine Release in Rat Hippocampus, Journal of Pharmacology and Experimental Therapeutics 251:3:1039-1044.

19. Plishker, G.A., White, P.H., and E.D. Cadman, (1986), Involvement of a Cytoplasmic Protein in Calcium-dependent Potassium Efflux in Red Blood Cells, American Journal of Physiology 251 (Cell Physiology 20):C535-C540.

20. Cadman, E. and J. Eichberg (1983), The Presence of Phospholipase A and Lysophospholipase Activities in Culture Supernatant Fluid from Alteromonas espejiana, International Journal of Biochemistry 15:1155-1159.

21. Serianni, A.S., Cadman, E.D., Pierce, J., Hayes, M.L., and R. Barker, (1982), Enzymic Synthesis of 13C-Enriched Aldoses, Ketoses and Their Phosphate Esters, in Methods in Enzymology 89, (Willis A. Wood ed.) pp. 83-92. Academic Press, New York.

22. Cadman, E.D., Bostwick, J.R., and J. Eichberg, (1979), Determination of protein by a modified Lowry procedure in the presence of some commonly used detergents, Analytical Biochemistry 96:21-23.


ABSTRACTS

1. Garvey, D.S., Wasicak, J., Lin, N.-H., He, Y., Elliott, R., Hettinger, A.-M., Lebold, S., Anderson, D.J., Cadman, E., Raszkiewicz, J., Sullivan, J., Arneric', S. and M. Williams, (1994), Isoxazole and Isothiazole Ligands that Interact with Neuronal Cholinergic Channel Receptors, Abstracts of papers of the American Chemical Society, 207:176-MEDI.

2. Cadman, E.D. and C.M. Lee, (1993), Regulation of the Release of Cytokines from Human Astrocytoma Cells, Neuroscience Abstracts 19:95.

3. Lin, N.-H., Anderson, D., Cadman, E., Garvey, D. and S.P. Arneric', (1992), Synthesis and evaluation of nicotinic analogs as neuronal nicotine receptor ligands, Abstracts of papers of the American Chemical Society 204 (Aug):76-MEDI.

4. Cadman, E.D. and S.P. Arneric', (1992), Evidence for functional diversity of neuronal nAChRs regulating neurotransmitter release in rat brain, Eighth International Cholinergic Symposium, Montreal.

5. Brioni, J.D., Linville, D.G., Cadman, E.D., Williams, M., Buckley, M., Anderson, D.J. and S.P. Arneric', (1991), Classical nicotinic agonists differentially affect cognition, cortical cerebral blood flow (CBF) and dopamine (DA) release, Neuroscience Abstracts 17:1236.

6. Garvey, D.S., Chung, J.Y.-L., Shue, Y.K., Cadman, E., Anderson, D., Arneric', S. and M. Williams, (1991), Novel amino terminally modified derivatives of oxotremorine are more efficacious agonists at cortical muscarinic receptors of the M-1 subtype, Neuroscience Abstracts 17:388.

7. Anderson, D.J., Cadman, E., Vella-Rountree, L., Arneric', S.P. and M. Williams, (1990), The aminopyridazine muscarinic agonist, SR 95639A, is a functional M2 receptor antagonist in rat brain, Neuroscience Abstracts 16:1059.

8. Cadman, E. and M. McKinney, (1990), Muscarinic receptor modulation of [3H]-acetylcholine release in mechanically-dissociated adult rat hippocampus, Neuroscience Abstracts 16:535.

9. Cadman, E.D. and T.W. Vickroy, (1988), Dissociation between adenylate cyclase inhibition and muscarinic autoreceptor regulation of [3H]-acetylcholine release from rat hippocampus, Neuroscience Abstracts 14:1329.

10. Cadman, E.D. and T.W. Vickroy, (1987), Muscarinic autoreceptor-mediated inhibition of acetylcholine release in cerebral cortical slices:  A model for testing drugs of potential therapeutic utility in Alzheimer's disease, Abbott Laboratories Technology Exchange Abstracts 159.

11. Vickroy, T.W. and E.D. Cadman, (1986), Electrically-induced release of cholecystokinin-like immunoreactive material from slices of rat cerebral cortex, Neuroscience Abstracts 12:825.

12. Plishker, G.A. and E. Cadman, (1983), 4,4'-Diisothiocyano-2-2'Disulfonic Acid Stilbene Enhancement of Calcium Uptake in Human Red Blood Cells, Federation Proceedings 42:2244.

INVITED LECTURES

- National Bioengineered Food Labeling Standard as part of UNPA's Regulatory Education Series Webinar, the UNPA webinar "In the BEginning"... Dietary Supplements Supply Chain Starts with Ag, February 10, 2022, https://www.youtube.com/watch?v=g6IRLfkdKmE.
- Importing Foods into the US, Merage Institute Food Innovation Summit, March 20, 2019; March 20, 2018; May 24, 2017; and June 14, 2016, Costa Mesa, CA.
- Understanding the New Facts Panel Regulations, UNPA Expert Insights Webinar, June 21, 2018
- Labeling 101; All Packaging Inc., Aurora, CO April 27, 2017
- Labeling Hot Topics, Naturally Boulder, Boulder, CO March 29, 2017
- Preparing for the New Nutrition Facts Box, Women in Packaging and Manufacturing, September 13, 2016
- FDA and Clinical Herbalism, Colorado School for Clinical Herbalism, October 25, 2019, Lafayette, CO; November 9, 2017, November 11, 2016 and October 22, 2015, Boulder, CO.
- Labeling Matters: Labeling Basics for Widgets, Watches and Waffles, Women in Packaging and Manufacturing, April 14, 2015 & Colorado Specialty Food Makers Group, October 21, 2015, Denver, CO.
- A Way Forward: Challenges and Opportunities with the US FDA: Western Canada Agri-Innovation Boot Camp, October 14 – 19, 2012, Winnipeg, Saskatoon and Vancouver.
- Regulatory Environment & Hurdles: Challenges & Opportunities, Food for Health: Agri-Innovation Conference, February 14, 2012, Canadian Consulate, San Francisco.
- Elevate your Brand: The Label as Table of Contents; Nosco Corollary Lecture; Supply Side West, October 12, 2011, Las Vegas, NV.
- An Introduction to Dietary Supplement Structure Function Claims, Regulatory Affairs Professional Society Annual Conference, October 24 -27, 2010, San Jose, CA.
- Nutritional Genomics and the Future of Food Labeling; Nutritional Genomics Conference; California State Polytechnic University, Pomona, CA, November 12-14, 2009
- Keynote Speaker, Denver Metro Area Chamber of Commerce, Small Business Development Center Awards Reception, May 17, 2002.  How to have a Healthy Business—VC Funding

# Attachment B



*A Service of Cadman Consulting Services, LLC*

Evelyn Cadman FDA Compliance Simplified Fee Schedule

Ms. Cadman's billing rate is $375 per hour for professional services, including case review and analysis, and report preparation.  The rate for deposition and trial testimony is $475 per hour. Travel Time is billed at $175 per hour with travel expenses reimbursed at actual cost.

9172 West 92nd Avenue * Westminster, CO 80021 * 303-432-1605



# Attachment C

**Appendix C – Cases with Previous Testimony by Evelyn Cadman**

Pursuant to Fed. R. Civ. P. 26(a)(2)(B)(v), the following is a list of all cases in which Ms. Evelyn Cadman has testified as an expert at trial or by deposition during the previous four years. This list is provided to the best of her recollection.

1. _ Coyne _ *v.* Society Botanicals et al; (Cowlitz County Superior Court, **Kelso, WA**); approximate date: July 6, 2023;

2. _ Talyor _ *v.* Mood Rite et al; (Deposition via zoom; approximate date: August 20, 2024;

# Attachment D

**Index to Records Production to/From Evelyn Cadman**

| Date Transmitted | Description | Bates No. |
|---|---|---|
|  |  |  |
| 09/21/24 | Batch Formula Energy Capsules V2 spreadsheet |  |
| 09/21/24 | Batch Formula Form 910 Caffeine and Motivation |  |
| 09/21/24 | Batch Formula Form 910 Energy and Creativity |  |
| 09/21/24 | Batch Formula Form 910 Clarity |  |
| 09/21/24 | Batch Formula Form 910 Logic |  |
| 09/21/24 | MMR Formula FB-10651 V01 Clarity Capsules spreadsheet |  |
| 09/21/24 | MMR Formula FB-10652 V01 Creativity Capsules spreadsheet |  |
| 09/21/24 | MMR Formula FB-10653 V01 Motivation Capsules spreadsheet |  |
| 09/21/24 | MMR Formula FB-10655 V01 Caffein Capsules spreadsheet |  |
| 09/21/24 | MMR Formula FB-10655 V01 Logic Capsules |  |
| 02/18/25 | Order Denying Motion to Compel Arbitration and Granting in Part and Denying in Part Motion to Dismiss |  |
| 03/02/25 | *Draft* Rule 34 Requests – Thesis Defendants |  |
| 04/15/25 | Declaration of Dr. Steven Dezell |  |
| 05/08/25; 08/25/25 | Brand Nutraceuticals Production Ticket for Formula Motivation Powder Blend | Brand Defendants_0033 |
| 05/08/25; 08/25/25 | Brand Nutraceuticals Production Ticket for Formula Clarity Powder Blend | Brand Defendants_0034 |
| 05/08/25; 08/25/25 | Brand Nutraceuticals Production Ticket for Formula Logic Powder Blend | Brand Defendants_0035 |
| 05/08/25; 08/25/25 | Brand Nutraceuticals Production Ticket for Formula Logic Powder Blend | Brand Defendants_0036 |
| 05/08/25; 08/25/25 | Brand Nutraceuticals Production Ticket for Formula Caffeine Powder Blend | Brand Defendants_0037 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Motivation | Brand Defendants_0038-41 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Clarity | Brand Defendants_0042-42 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Creativity | Brand Defendants_0046-49 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Caffeine | Brand Defendants_0050-53 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Energy | Brand Defendants_0054-57 |

| | | |
|---|---|---|
| 05/08/25; 08/25/25 | Batch Formula Form 910 Logic | Brand Defendants_0058-61 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Motivation (same as Plaintiffs) | Brand Defendants_0062 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Caffeine (same as Plaintiffs) | Brand Defendants_0063 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Clarity (same as Plaintiffs) | Brand Defendants_0064 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Logic (same as Plaintiffs) | Brand Defendants_0065 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Creativity (same as Plaintiffs) | Brand Defendants_0066 |
| 05/08/25; 08/25/25 | Batch Formula Form 910 Energy (same as Plaintiffs) | Brand Defendants_0067 |
| 05/08/25; 08/25/25 | 29-Formula for Energy | Thesis 205-208 |
| 05/08/25; 08/25/25 | 30-Formula for Clarity | Thesis 161-164; 213-216 |
| 05/08/25; 08/25/25 | 31-Formula for Creativity | Thesis 165-168; 217-220 |
| 05/08/25; 08/25/25 | 32-Formula for Motivation | Thesis 169-172;221-224 |
| 05/08/25; 08/25/25 | 33-Formula for Caffeine | Thesis 173-176 |
| 05/08/25; 08/25/25 | 34-Formula for Logic | Thesis 177-180; 225-228 |
| 05/08/25; 08/25/25 | Form 910 for Caffeine and Motivation | Thesis 134-135 |
| 05/08/25; 08/25/25 | Form 910 for Energy and Creativity | Thesis 146-147 |
| 05/08/25; 08/25/25 | Form 910 for Thesis Clarity | Thesis 148 |
| 05/08/25; 08/25/25 | Form 910 for Thesis Logic | Thesis 149 |
| 05/08/25; 08/25/25 | Def Thesis Privilege Log | |
| 08/25/25 | NSF Testing Report | Plaintiff 000293-304 |
| 08/25/25 | 03/17/23 FDA Warning Letter to Brand Packaging Group, Inc. | |
| 08/25/25 | Batch reports provided between 1/27/25 – 4/30/25 over 13 document productions | |
| 08/25/25 | Alkemist post-litigation testing for Amphetamines | Thesis 007240-7244, 7455-7470 |
| 09/21/25 | 7/23/21 EM from Colmaric Analytics to Jacob Malamed @ FindMyFormula re: artichoke | Thesis 034511-34512 |

| | | |
|---|---|---|
| 09/21/25 | 05/24/21 EM from Jacob Malamed @ FindMyFormula to Alaska Spring Pharma re: Dynamine | Thesis 031902-31908 |
| 09/21/25 | 08/16/21 EM from Scott Koleda @ Gemini Pharm to Jacob Malamed @ FindMyFormula re: Motivation | Thesis 035203-35209 |
| 09/22/25 | 09/08/21 EM from Matt Rubin to Sarah Sayage re "Waiver Lot Code" | Thesis 002881-2882 |
| 09/22/25 | 07/23/21 EM from Jacob Malmed to Joe Mulcahey re: Formula | Thesis 034436-34438 |
| | 75-Day Premarket NDIN 1995 to Present List | |
| | FDA Import Alerts | |
| | 2023 Li, Article: An evaluation of adverse drug reactions and outcomes attributed to kratom in the US Food and Drug Administration Adverse Event Reporting System from January 2004 through September 2021 | |
| | About CPSC info | |
| | US Consumer Product Safety Commission landing page | |
| | FDA Warning letter to Brand Packaging Group, Inc., dated 03/17/23 | |
| | FDA Warning letter to SoloVital, dated 08/27/24 | |
| | FDA Warning letter to TEK Naturals, dated 02/05/19 | |
| | 2020 Article: Role of Synthetic B1 Vitamin Sulbutiamine on Health | |
| | FDA Warning letter to Pure Nootropics, LLC, dated 02/05/19 | |
| | FDA Warning letter to Peak Nootropics LLC aka Advanced Nootropics, dated 02/05/19 | |
| | 2024 Paiva, Article: Adulteration of Brain Health (Cognitive, Mood, and Sleep Enhancement) Food Supplements by the Addition of Pharmaceutical Drugs: A Comprehensive Review of Analytical Approaches and Trends | |
| | 2022 Malik, Article: Nootropics as Cognitive Enhancers: Types, Dosage and Side Effects of Smart Drugs | |
| | Wikipedia Nootropic definition | |
| | FDA Warning letter to Gluten Free Remedies, LLC, dated 04/15/25 | |
| | 2021 Cohen, Article: Five Unapproved Drugs Found in Cognitive Enhancement Supplements | |

| | | |
|---|---|---|
| | Import Alert 66-41, dated 05/19/23 | |
| | 2016 Article: AMA Confronts the Rise of Nootropics | |
| | FDA – Adulteration from New Dietary Ingredients in Dietary Supplements – Background for Industry | |
| | FDA Adulteration Warning letter to Princess Lifestyles, LLC, dated 02/23/22 | |
| | Definition of Dietary Supplements | |
| | FDA - Small Entity Compliance Guide on Structure/Function Claims, dated Jan 2002 | |
| | FDA – How U.S. FDA's GRAS Notification Program Works, Dated Dec 2005/Jan 2006 | |
| | FDA - Highly Concentrated Caffein in Dietary Supplements: Guidance for Industry, dated April 2018 | |
| | 2023 Pippins, Article: FTC and NAD Remind Industry of their Authority Over All Health Product Advertising (Including Rx) | |
| | FDA – FSMA Final Rule on Amendments to Registration of Food Facilities | |
| | FDA – Food Facility Registration User Guide: Biennial Registration Renewal | |
| | FDA – What do food facilities need to know about this year's biennial registrational renewal period? | |
| | 1997 Federal Register Notice - Food Labeling: Nutrient Content Claims: Definition of "High Potency" and Definition of "Antioxidant" for Use in Nutrient Content Claims for Dietary Supplements and Conventional Foods | |
| | 2008 Federal Register Notice - Small Entity Compliance Guide: Food Labeling: Nutrient Content Claims: Definition of "High Potency" and Definition of "Antioxidant" for Use in Nutrient Content Claims for Dietary Supplements and Conventional Foods | |
| | FDA – warns companies selling illegal, unapproved kratom products marketed for opioid cessation, pain treatment and other medical uses, dated 05/22/18 | |
| | FDA Guidance for Industry Street Drug Alternatives | |
| | FDA – What You Need to Know About the FDA Regulation: Current Good Manufacturing Practice, Hazard Analysis, and Risk-Based | |

| | | |
|---|---|---|
| | Preventive Controls for Human Food (21 CFR Part 117): Guidance for Industry Small Entity Compliance Guide | |
| | FDA - Dietary Supplement Labeling Guide: Chapter VII. Premarket Notification of New Dietary Ingredients, dated April 2005 | |
| | FDA - Dietary Supplement Labeling Guide: Chapter I. General Dietary Supplement Labeling, dated April 2005 | |
| | Food And Drug Administration Compliance Program Guidance Manual, dated 09/30/20 | |
| | FDA - Advertising & Promotional Labeling Questions and Answers | |
| | 21 U.S. Code §343 – Misbranded food | |
| | FDA Response Ltr re Uridine, dated 03/14/03 | |
| | 75-Day Premarket NDIN 1995 to Present List, dated 03/11/25 | |
| | FDA – *Draft* Dietary Supplements: New Dietary Ingredient Notifications and Related Issues: Guidance for Industry, dated Aug 2016 | |
| | FDA Courtesy letter to Divinity Products, dated 01/28/13 | |
| | FDA Courtesy letter to Divinity Products, dated 02/21/13 | |
| | FDA - CFSAN Online Submission Module | |
| | FDA Courtesy letter to Amorepacific, dated 12/01/15 | |
| | FDA - Pages from NDIN Bifidobacterium breve asking for more data, dated 08/10/21 | |
| | FDA – New Dietary Ingredient (NDI) Safety Information | |
| | FDA-2021-S-0023-0696 attachment 1 | |
| | FDA-2021-S-0023-0060 attachment 1 | |
| | FDA-2020-S-0023-0017 attachment 1 | |
| | FDA-2018-S-0023-0033 attachment 1 | |
| | FDA Memo re Applephenon, dated 06/13/11 | |
| | FDA Chart of AKL Response Letters | |
| | FDA-2011-S-0933-0198 re Zembrin | |
| | FDA-2011-S-0933-0194 attachment 1 Zembrin NDIN references | |
| | FDA-2011-S-0933-0193 attachment 1 Zembrin NDIN History of Use | |
| | FDA Memo re Zembrin, dated 04/20/11 | |
| | FDA-2011-S-0933-0184 attachment 1 | |
| | Warning Valerian Root | |

|  | Warning True Calm |  |
|---|---|---|
|  | Warning The Official Sleep Supplement |  |
|  | Warning Mood Support |  |
|  | Warning Kava Kava Extract |  |
|  | Warning Hawthorn Berry Supplement |  |
|  | Warning Gymnema Sylvestre |  |