UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOANN LEDOUX, a single woman,<br><br>Plaintiff,<br><br>v.<br><br>OUTLIERS, INC. (d/b/a THESIS, THESIS NOOTROPICS, FIND MY FORMULA, and FORMULA), et al.<br><br>Defendants. | Case No. 3:24-cv-05808-TMC<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

Plaintiff Joann LeDoux, a nurse for the Army, alleges that Defendants'[1] nootropic supplement kits were adulterated with amphetamines and other ingredients that Defendants failed to disclose. Dkt. 45 ¶¶ 92–94, 100. In January 2026, this Court granted partial summary judgment and dismissed Plaintiff's claims to the extent they relied on her primary theory of liability—that the supplements caused Plaintiff to test positive on a routine drug screening and

[1] Defendants include Outliers, Inc. (doing business as Thesis Nootropics), Brand Nutraceuticals, Inc. (doing business as Brand Nutra), Brand Packaging Group, Inc., and one to five unidentified Doe defendants. Dkt. 45 ¶¶ 2–9. Although Plaintiff also sued Daniel Freed and Matt Rubin—Thesis's CEO and Director of Supply Chain, respectively—the Court dismissed these claims without prejudice on October 28, 2025. *Id.* ¶¶ 3–4; Dkt. 169.

resulted in a court martial, a missed promotion, and various other damages. Dkt. 202. Defendants now move for summary judgment against Plaintiff's remaining claims and theories. Dkt. 207. Defendants also ask the Court to exclude evidence from two of Plaintiff's remaining experts. Dkts. 206, 208.

Finding oral argument unnecessary, the Court GRANTS Defendants' motion to exclude Ms. Evelyn Cadman (Dkt. 206), GRANTS their motion to exclude Dr. Gabriel Holguin (Dkt. 208), and GRANTS their motion for summary judgment (Dkt. 207). Plaintiff's remaining claims are DISMISSED WITH PREJUDICE and without leave to amend.

## II. BACKGROUND

The Court discussed the facts of this case in detail when it addressed the motions for partial summary judgment and will not do so again here. Dkt. 202 at 2–8. When the Court granted partial summary judgment, it ordered the following:

> The Court GRANTS IN PART Defendants' motion to exclude and strike Plaintiff's expert evidence. Dkt. 194. Expert evidence provided by Drs. Dezell, Okano, and Shippee, along with Mr. Kababick's second report, is STRICKEN from the record and may not be used "to supply evidence on a motion, at a hearing, or at trial." Fed. R. Civ. P. 37(c)(1).
>
> The Court GRANTS IN PART Defendants' motion for partial summary judgment. Dkt. 112. Plaintiff's claims are DISMISSED WITH PREJUDICE to the extent they (1) rely on allegations of amphetamine adulteration and (2) claim damages caused by Plaintiff's positive test for amphetamines. Defendants' motion for partial summary judgment is DENIED IN PART with respect to the argument that Plaintiff's [Consumer Protection Act ("CPA")] claim is not legally cognizable, for the reasons previously explained in the Court's order on Defendants' motion to dismiss. *See* Dkt. 169. As with all of Plaintiffs' claims, however, the CPA claim is barred to the extent it relies on allegations of amphetamine adulteration.

*Id.* at 23. On July 8, 2026, the Court denied Plaintiff's motion for lesser sanctions wherein she asked the Court to reconsider its wholesale exclusion of her experts. Dkt. 262.

The Court also issued *sua sponte* sanctions against Plaintiff's attorney, Ms. Jocelyn Stewart, for generating numerous false citations with artificial intelligence and submitting them to the Court without verification. Dkt. 265. Multiple such citations existed in the expert reports of Mr. James Kababick and Dr. Ronald Shippee, where Plaintiff admitted that "she used Claude or ChatGPT to 'generate a formatted citation table' for academic articles and 'provided the same AI-generated citation table to both experts as an appendix, and neither expert caught the errors in the citation data before signing their reports.'" Dkt. 265 at 7 (quoting Dkt. 245 at 17–18).

Defendants now move to exclude the expert opinions of Ms. Evelyn Cadman and Dr. Gabriel Holguin. Dkts. 206, 208. Defendants argue that (1) Ms. Cadman's opinion offers impermissible legal conclusions and is unreliable, Dkt. 206 at 4–9, and (2) Dr. Holguin's opinion relates only to theories of liability this Court already dismissed and contains citation errors like those forming the basis for the Court's sanctions against Ms. Stewart. Dkt. 208 at 3–5.

Defendants also move for summary judgment on Plaintiff's remaining claims, which assert that Defendants' products contained New Dietary Ingredients ("NDI") and that Defendants misrepresented their products' qualities and violated the Food, Drug, and Cosmetic Act ("FDCA"). Dkt. 207 at 4 (citing Dkt. 45). Defendants challenge these claims on multiple grounds, including by arguing that Plaintiff cannot prove any damages. Specifically, Defendants assert that (1) Plaintiff has not shown that any health symptoms she suffered were caused by Defendants' products; and (2) any damages based on the purchase price that Plaintiff paid for Defendants' products are moot because Defendants have already given Plaintiff an unconditional payment above the maximum amount Plaintiff could recover based on the purchase price. *Id*. at 9–26.

## III. LEGAL STANDARDS

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1122 (9th Cir. 2024) (quoting *Anderson*, 477 U.S. at 256).

The evidence relied upon by either party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). However, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn

in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (alteration in original) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

**B. Federal Rule of Evidence 702 and *Daubert***

Federal Rule of Evidence 702 governs the admissibility of expert testimony. "Expert testimony must be both relevant and reliable." *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001). Before trial, "[t]he trial court acts as a 'gatekeeper' to exclude expert testimony that" does not meet these standards. *Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1193, 1201 (D. Nev. 2008) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999)).

Expert testimony is relevant if it will help "the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert I*), 509 U.S. 579, 591 (1993) (quoting Fed. R. Evid. 702(a)); *see also Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1315 (9th Cir. 1995) (explaining that relevant evidence is that which "logically advances a material aspect of the proposing party's case"), *cert. denied*, 516 U.S. 869 (1995).

Expert testimony is reliable if it "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (c), (d). More generally, evidence is reliable if it "has a reliable basis in the knowledge and experience of [the relevant] discipline." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (alteration in original) (quoting *Kumho Tire*, 526 U.S. at 149). In *Daubert*, the Supreme Court set out several factors that courts consider in determining reliability:

> (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether the technique is generally accepted.

*Neal-Lomax*, 574 F. Supp. 2d at 1201 (quoting *Daubert I*, 509 U.S. at 593–94). But these factors are not a "definitive checklist or test," *see Daubert I*, 509 U.S. at 593, and "[i]n other cases, the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire*, 526 U.S. at 150. Nor do the *Daubert* factors "necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Id.* at 151. Rather, "Rule 702 grants the district judge the discretionary authority . . . to determine reliability in light of the particular facts and circumstances of the particular case." *Id*. at 158; *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("[A] trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." (internal quotation marks and emphasis omitted)).

## IV. DISCUSSION

### A. The Court GRANTS Defendants' motion to exclude Ms. Evelyn Cadman (Dkt. 206).

Defendants ask the Court to exclude expert evidence from Ms. Evelyn Cadman, retained by Plaintiff to render "opinions regarding the regulatory status of the dietary supplement product" sold to Plaintiff by Defendants. Dkt. 206-1 at 2. According to Defendants, Cadman impermissibly "offers only legal advocacy—applying federal statutes and regulations to alleged facts and pronouncing whether Defendants violated the law—telling the Court and jury what judgments to reach." Dkt. 206 at 1. The Court agrees with Defendants.

While Federal Rule of Evidence 704(a) states that "[a]n opinion is not objectionable just because it embraces an ultimate issue," the Ninth Circuit "has repeatedly affirmed that 'an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of

law.'" *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (quoting *Hangarter*, 373 F.3d at 1016). "This prohibition of opinion testimony on an ultimate issue of law recognizes that, 'when an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.'" *Id.* (alteration and emphasis omitted) (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

Here, Ms. Cadman's analysis and conclusions relate solely to whether Defendants' products were "adulterated" under federal law or whether Defendants violated federal law in labeling or marketing those products. Dkt. 206-1. For example, Ms. Cadman concludes that:

- [T]he product sold to [Plaintiff] was adulterated as that term is defined in 21 U.S.C. § 342(a)(1) and (a)(2)(C), and under the implementing regulations at 21 C.F.R. Part 111 and 21 C.F.R. § 190.6. It contained one or more substances that qualify as new dietary ingredients for which the required 75-day premarket notification under 21 U.S.C. § 350b and 21 C.F.R. § 190.6 was not filed.

- [C]ertain ingredients in the product have pharmacological effects and are not appropriately classified as dietary ingredients under 21 U.S.C. § 321(f) and 21 C.F.R. §§ 101.36 and 190.10. The inclusion of such substances renders the product adulterated.

- [T]he product at issue contained one or more substances that fall outside the definition of a dietary ingredient and instead meet the definition of a "drug" under 21 U.S.C. § 321(g)(1), as further clarified in the regulations at 21 C.F.R. § 201.128 (intended uses) and 21 C.F.R. § 310.3 (new drugs).

- [T]he product packaging and labeling for the Thesis supplement sold to [Plaintiff] failed to meet the requirements of the Food, Drug, and Cosmetic Act and associated FDA regulations concerning adequate warnings and disclosures.

- [T]he Defendants' manufacturing and quality control procedures, including their handling of batch records and testing protocols, were not consistent with Current Good Manufacturing Practices (cGMPs) as codified in 21 C.F.R. Part 111.

*Id.* at 2–4. The remainder of Ms. Cadman's opinion contains similar analysis explaining how Defendants' practices violated various federal statutes and regulations. *Id.* at 4–6.

Ms. Cadman's opinion offers impermissible legal conclusions that are irrelevant because they do not "aid the jury in making its decision." *Fontana v. City of Auburn*, No. C13-0245-JCC, 2014 WL 4162528, at *6 (W.D. Wash. Aug. 21, 2014), *aff'd in part*, 679 F. App'x 613 (9th Cir. 2017). If an expert witness uses terms that have a specialized meaning in the law and that "represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case," the testimony is an impermissible legal conclusion. *Diaz*, 876 F.3d at 1198–99. Terms such as "new dietary ingredient" and "adulterated" have a "separate, distinct[,] and specialized meaning in the law different from that present in the vernacular." *Id.* at 1198 (quoting *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)). Ms. Cadman's findings that Defendants violated federal regulations are similarly impermissible legal conclusions. *See Georges v. Novartis Pharms. Corp.*, No. CV 06-5207 SJO VBKX, 2012 WL 9064768, at *9–10 (C.D. Cal. Nov. 2, 2012) (allowing testimony "generally regarding pharmaceutical drugs within the context of the FDA" but not "legal conclusions on . . . whether Defendant was in regulatory compliance with the FDA").

Citing *In re Fosamax Products Liability Litigation*, Plaintiff argues that Ms. Cadman may opine on "general FDA regulatory requirements and procedures" and Defendants' compliance with them. Dkt. 210 at 20–21 (quoting 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009)). But Ms. Cadman's opinion is distinguishable from those of other regulatory experts that courts have deemed admissible. Critically, Ms. Cadman does not offer any specialized knowledge about FDA requirements that would assist a jury. *Cf. In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 191 ("A lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry. Dr. Parisian's assessment of the reasonableness of Merck's conduct in light of her experience and her understanding of FDA regulations will be helpful to the jury.").

Instead, Ms. Cadman simply (1) identifies relevant statutes and regulations and (2) explains her conclusion that Defendants' conduct violated those statutes and regulations. For example, Ms. Cadman notes that Thesis's products contained Zembrin and that the FDA previously declined another company's use of Zembrin in a dietary supplement because of "insufficient verification of safety for human consumption." Dkt. 206-1 at 3. She then concludes that "[a]ccordingly, Zembrin's inclusion in a dietary supplement—absent an accepted NDI notification or exemption—renders the product adulterated under 21 U.S.C. § 342(f)(1)(B)." *Id.* This "reads much like a legal memorandum, making legal conclusions, commenting on the applicable law, and applying the law to the facts." *Enberg v. Am. Home Assurance*, No. CV-11-125-BLG-RFC, 2013 WL 11821480, at *1 (D. Mont. Feb. 13, 2013). Aside from her reference to a previous FDA decision—which she does not name or specify any details about—Ms. Cadman's expertise plays no role in her opinion that a product with Zembrin is "adulterated" under federal law. Absent the use of any specialized knowledge, it is improper for Ms. Cadman to advance these arguments "cloaked with the mantle of an expert" and perhaps "carry special weight with the jury." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir.), *op. amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001).

Ms. Cadman's opinion is not relevant under *Daubert*. The Court therefore GRANTS Defendants' motion to exclude Ms. Cadman.[2] Dkt. 206.

---

[2] Both Ms. Cadman and Dr. Holguin submitted declarations which attempt to "clarify" their expert reports. Dkts. 211-1, 214-2. Because Plaintiff has not explained why these should be considered as part of the expert record when she submitted them more than four months after the expert disclosure deadline of September 22, 2025, *see* Dkt. 37, the Court declines to consider them as part of the experts' opinions, just as it has rejected similar "supplemental" reports in this case. Dkt. 202 at 14–19.

To the extent that the declarations withdraw certain portions of the expert opinions, the Court does not rely on those withdrawn portions in making any ruling here. *See* Dkt. 210 at 21–22 (withdrawing portions of the Cadman opinion that spoke to the state of mind of Defendant);

**B. The Court GRANTS Defendants' motion to exclude Dr. Gabriel Holguin (Dkt. 208).**

Defendants also ask the Court to strike Dr. Holguin's opinion about the "psychological impacts of the dietary supplement product sold to [Plaintiff]." Dkt. 208-1 at 2. Defendants argue that Dr. Holguin's opinion (1) is irrelevant because it concerns only claims which the Court has already dismissed and (2) is unreliable because it contains citations "hallucinated" by artificial intelligence. Dkt. 208 at 3–6.

First, Plaintiff has agreed to withdraw the first three of four opinions in Dr. Holguin's expert report "because they were linked to consequences of the positive drug test results" and the theory of liability the Court found was unavailable to Plaintiff when it granted partial summary judgment. Dkt. 213-1 at 10 (citing Dkt. 202). Dr. Holguin's fourth and only remaining opinion is as follows:

> **4. Time-linked symptom course consistent with stimulant withdrawal and stress response**
>
> The marked fatigue, hypersomnia, cognitive fog, and mood lability reported in October 2021 after abrupt cessation of Thesis products are consistent with the clinical course of stimulant/amphetamine withdrawal and stress-related decompensation—especially when superimposed on occupational and psycholegal stressors. Plaintiff described under oath about the intense fatigue and concentration problems she experienced after stopping the supplements; subsequent negative urine/hair testing after cessation dovetails with the reported symptom course. The acute symptom pattern is consistent with clinical reviews of amphetamine withdrawal. Additionally, when depressive and anxiety symptoms arising from her court-martial, flagging, and removal from clinical duties are considered alongside the physiological symptoms of stimulant withdrawal, the combined burden and multifaceted and complex clinical picture can result in a synergistic impact. In clinical terms, the psychiatric stressors and the neurochemical withdrawal would be expected to exacerbate one another, thereby intensifying both the severity and duration of functional impairment.

Dkt. 208-1 at 4–5.

---

Dkt. 214-2 at 4–5 (withdrawing portions of the Holguin opinion that relate to claims the Court dismissed in granting partial summary judgment).

Defendants argue that, like the other three opinions that Plaintiff has already withdrawn, this fourth opinion is foreclosed by the Court's partial summary judgment order. Dkt. 208 at 4. According to Defendants, Dr. Holguin's opinion that Plaintiff experienced symptoms "consistent with the clinical course of stimulant/amphetamine withdrawal" is "render[ed] . . . irrelevant" by the Court's "disposing of [Plaintiff's] amphetamines theory." *Id*.

The Court's partial summary judgment order does not preclude Dr. Holguin's fourth opinion. That order dismissed claims "to the extent they (1) rel[ied] on allegations of amphetamine adulteration *and* (2) claim[ed] damages caused by Plaintiff's positive test for amphetamines." Dkt. 202 at 23 (emphasis added). Defendants' broad reading would preclude any claims based on amphetamine adulteration *at all*, which is not what this Court intended. Rather, the Court barred claims based on Plaintiff's "urinalysis theory" that amphetamine adulteration caused Plaintiff to test positive on a drug screening. *Id*. at 10, 20–23. The claim that Plaintiff ingested adulterated products (whether with amphetamines, other stimulants, or other ingredients) that caused negative health effects was not precluded by the Court's ruling, nor were any otherwise-admissible expert opinions which relate to that claim.

But Dr. Holguin's report also contains "hallucinated" citations to academic articles which appear generated by artificial intelligence. Dkt. 208-2 at 2–3. Because Plaintiff withdrew the portions of Dr. Holguin's opinion containing these citations, the Court did not address them when it ordered Plaintiff's counsel to show cause—and ultimately sanctioned her—for her unverified use of generative artificial intelligence and submission of false citations to the Court. Dkts. 209, 265. Defendants argue that, even though these citations exist only in the withdrawn portions of Dr. Holguin's opinion, they "irreparably undermine[] Holguin's credibility, rendering his opinions unreliable." Dkt. 208 at 3.

The Court agrees with Defendants and finds that Dr. Holguin's multiple hallucinated citations "shatter[] his credibility with this Court." *Kohls v. Ellison*, No. 24-CV-3754 (LMP/DLM), 2025 WL 66514, at *4 (D. Minn. Jan. 10, 2025). While Plaintiff's counsel was not asked to provide information about these citations, the errors are similar to those in other expert reports where she "used Claude or ChatGPT to 'generate a formatted citation table' for academic articles and 'provided the same AI-generated citation table to both experts as an appendix, and neither expert caught the errors in the citation data before signing their reports.'" Dkt. 265 at 7 (quoting Dkt. 245 at 17–18). This level of involvement from counsel in drafting (with AI) the list of materials supposedly relied upon by Dr. Holguin, and Dr. Holguin's lack of diligence in verifying the sources that he represented were the basis for his opinion, prevent Plaintiff from meeting her burden to show that Dr. Holguin's opinion is "based on sufficient facts or data," is "the product of reliable principles and methods," or "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). Thus, although these errors occur only in the withdrawn portions of Dr. Holguin's opinion, they "undermine[] the overall credibility" of the report. *Concord Music Grp., Inc. v. Anthropic PBC*, No. 24-CV-03811-EKL (SVK), 2025 WL 1482734, at *3 (N.D. Cal. May 23, 2025).

The Court finds that the hallucinated citations undermine Dr. Holguin's entire report and that the report is not reliable under *Daubert*. The Court therefore GRANTS Defendants' motion to exclude Dr. Holguin. Dkt. 208.

**C. The Court GRANTS Defendants' motion for summary judgment (Dkt. 207).**

Each of Plaintiff's remaining claims alleges damages based on either (1) medical symptoms from Plaintiff's consumption of and subsequent withdrawal from ingredients in Defendants' supplements or (2) the purchase price Plaintiff paid for Defendants' supplements. Dkt. 222 at 20–30, 35–39. Defendants argue that neither category of damages is available

because Plaintiff cannot prove that the supplements caused her withdrawal symptoms and because she has received an unconditional tender of $13,000, which exceeds the maximum amount she could obtain based on the purchase price of the supplements.[3] Dkt. 207 at 9–15, 23–26. The Court agrees with Defendants and finds that each of Plaintiff's remaining claims fails because she is unable to prove that she suffered any damages as a result of Defendants' conduct.

*1. Plaintiff cannot prove that Defendants' supplement kits caused any medical damages.*

Plaintiff alleges medical damages from her consumption of and subsequent withdrawal from ingredients in Defendants' supplements. Dkt. 45 ¶ 130. Defendants argue that these claims fail because Plaintiff does not have the expert evidence necessary to prove this "medically complex" theory of damages and, even if an expert were not required, the available evidence is insufficient to convince a reasonable jury that Defendants caused any of Plaintiff's medical symptoms. Dkt. 207 at 9–15. Defendants' arguments mirror those that the Court previously found persuasive in granting partial summary judgment against Plaintiff's urinalysis theory. Dkt. 202 at 12–13, 20–23. The Court finds that the same reasoning applies against Plaintiff's medical damages.

First, Plaintiff's theory of medical damages is medically complex and would require expert testimony at trial. Washington courts require expert testimony to establish causation for "complex questions that laypersons would not be able to answer without medical training." *Spence v. Walsh*, 19 Wn. App. 2d 1018, 2021 WL 4432745, at *3 (2021); *see Lo v. United*

[3] Defendants also argue that Plaintiff's claims premised on the FDCA are preempted and that her misrepresentation claims are inactionable because she did not rely on any alleged misrepresentations and all representations were mere puffery. Dkt. 207 at 7–9, 16–23. Because the Court finds that summary judgment is warranted on other grounds, it does not address these arguments.

*States*, No. 2:17-CV-01202-TL, 2023 WL 2014331, at *18 (W.D. Wash. Feb. 15, 2023) (noting that expert testimony is required where an injury "involves obscure medical factors that would require an ordinary lay person to speculate or conjecture in making a finding" (quoting *Bruns v. PACCAR, Inc.*, 77 Wn. App. 201, 214, 890 P.2d 469 (1995))). Washington courts have rejected the argument that "only medical testimony can show causation" but clarified that "[m]edical causation must be established by a more-likely-than-not standard." *Ma'ele v. Arrington*, 111 Wn. App. 557, 563–64, 45 P.3d 557 (2002)). On the other hand, "material facts could be within the expertise of a layman when they are observable by the layman's senses and describable without medical training." *Pagnotta v. Beall Trailers of Or., Inc.*, 99 Wn. App. 28, 33, 991 P.2d 728 (2000) (citing *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 228, 770 P.2d 182 (1989)).

Plaintiff alleges the following in her complaint:

> Due to DEFENDANTS' wrongful acts and omissions, JOANN LEDOUX suffered physiological withdrawal effects when she suddenly terminated the use of THESIS' Formula Nootropic Supplements. She experienced depression combined with cravings and dependency symptoms, including that she was unable to stay awake, alert, or mentally present, despite ingesting copious amounts of caffeine. She gained substantial weight as a result of depression and attendant overeating. JOANN LEDOUX fell into a spiraling depression from the feelings of shame and embarrassment at being a medical provider who was duped by DEFENDANTS' marketing. She often neglected her own basic needs including hygiene, sleeping too much at times, or bouts of insomnia. JOANN LEDOUX's mental thought processes were overrun by looping and intrusive thoughts of shame from her unwitting ingestion of Adderall® without a prescription and other ingredients in DEFENDANTS' Formula Nootropic Supplement products. JOANN LEDOUX experienced overwhelming bouts of guilt that she had offered DEFENDANTS' Formula Nootropic Supplement products to her medical provider colleagues and friends for their own ingestion, which thankfully they all declined.

Dkt. 45 ¶ 130.

Much like Plaintiff's urinalysis theory, these allegations pose medically complex questions requiring an expert to link Defendants' products to Plaintiffs' symptoms. *See* Dkt. 202

at 12–13. But no remaining expert in the record discusses how the supplements could have caused withdrawal symptoms or any other medical damages.

Even if the Court considered Dr. Holguin's opinion despite its unreliability, it does not speak directly to medical causation. Instead, Dr. Holguin opines that the symptoms Plaintiff reported experiencing after she stopped taking Thesis products—namely "fatigue, hypersomnia, cognitive fog, and mood lability"—are "consistent with the clinical course of stimulant/amphetamine withdrawal." Dkt. 208-1 at 4. But as the Court noted in its partial summary judgment order, more is required. Dkt. 202 at 20–21 (finding that Mr. Kababick's opinion that "there is no way to know that the products [Plaintiff] ingested were not adulterated" could not prove causation). To support causation, "[e]xpert testimony must demonstrate that the defendant's conduct probably or more likely than not caused the injury, rather than might have, could have, or possibly did." *Bolson*, 2014 WL 2211401, at *6 (internal quotation marks omitted) (quoting *Fabrique v. Choice Hotels Int'l, Inc.*, 144 Wn. App. 675, 687, 183 P.3d 1118 (2008)); *Rathod v. United States*, No. 22-36045, 2023 WL 8710550, at *1 (9th Cir. Dec. 18, 2023) ("Summary judgment is appropriate where a plaintiff's expert fails to identify specific facts in support of a causation analysis."). And as Defendants note, Holguin "indisputably never opined on more-likely-than-not causation." Dkt. 207 at 12. Thus, summary judgment on Plaintiff's claims for medical damages is appropriate.

Second, even if Plaintiff was not required to produce an expert opinion addressing causation, her claims for medical damages do not survive summary judgment. Viewed in the light most favorable to Plaintiff, the available evidence supports no more than a speculative chance that Plaintiff's withdrawal or other medical symptoms resulted from Thesis's conduct. As discussed in the Court's order granting partial summary judgment:

> After she tested positive, Plaintiff tested her own samples of Thesis supplements, and Defendants tested a sample from each batch that could have been sold to Plaintiff. Dkt. 113-1 at 14–15, 128–29, 150–51, 162, 175–95. In both tests, all four types of supplements tested negative for amphetamines. *Id*. at 128–29, 162, 175–95. Brand requires that its vendors submit certificates of analysis with identity tests, and no relevant ingredient purports to contain amphetamines. *Id.* at 21–22, 30–116. Brand is also certified by NSF International, the same organization to which Plaintiff sent her supplements for testing. *Id.* at 118–20. The certification is part of a "good manufacturing practices registration program" that requires Brand to meet certain standards of training, cleanliness, and recordkeeping, and be subject to a yearly inspection and audit. *Id*. at 130–32. The certification requires the manufacturer to sign an affidavit that they do not produce or purchase any substances "on the NSF 306 list," including amphetamines. *Id*. at 132–33. Moreover, Plaintiff tested positive for Adderall's proprietary three-to-one ratio of D-amphetamines to L-amphetamines. Dkt. 113-1 at 226. Plaintiff has not shown that any amphetamines, let alone Adderall, ever made their way into any Thesis or Brand product.

Dkt. 202 at 21. The Court then discussed Plaintiff's evidence of adulteration, which included Plaintiff's positive drug test followed by a negative test after stopping her use of Thesis supplements and the fact that neither Thesis nor Brand screened ingredients in Thesis supplements for amphetamines. *Id*. at 22. The Court found that "[n]o jury could reasonably conclude from this evidence that Thesis supplements caused Plaintiff's positive urinalysis." *Id*.

The same is true for Plaintiff's medical damages here. Plaintiff presents no evidence from which a reasonable jury could find Defendants at fault for any withdrawal-like symptoms or other medical conditions. Plaintiff argues that her symptom testimony is backed by her medical experience, but such testimony can only establish that Plaintiff experienced "fatigue, hypersomnia, cognitive fog, and mood instability" days after she stopped taking Thesis supplements. Dkt. 222 at 27–28. Like with Dr. Holguin's opinion, Plaintiff's testimony cannot establish that the supplements *caused* those symptoms because they contained amphetamines or any NDI. In fact, Dr. Holguin suggests that other factors are just as likely to have caused any symptoms. *See* Dkt. 208-1 at 4–5 ("[W]hen depressive and anxiety symptoms arising from her

court-martial, flagging, and removal from clinical duties are considered alongside the physiological symptoms of stimulant withdrawal, the combined burden and multifaceted and complex clinical picture can result in a synergistic impact.”).[4]

Considering Plaintiff’s limited evidence regarding causation, Defendants’ tests and certifications indicating that Thesis products did not contain amphetamines, and the likelihood of other potential causes, a jury would ultimately be “left to speculate” as to the true culprit of Plaintiff’s symptoms. *Mendez Jimenez v. County of Sacramento*, No. 218CV00044JAMKJN, 2019 WL 5862909, at *2 (E.D. Cal. Nov. 8, 2019). “[Plaintiff’s] speculation does not create a factual dispute.” *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995). Thus, even if Plaintiff was not required to provide a relevant expert, her claims based on medical damages fail because there is no material dispute of fact as to whether Thesis supplements caused any medical symptoms.[5]

2. *Any damages based on the purchase price Plaintiff paid for Defendants’ products were rendered moot by Defendants’ unconditional payment.*

Defendants next attack Plaintiff’s state-law claims to recover the purchase price she paid for Defendants’ products. Dkt. 207 at 24–25 (citing Dkt. 45 ¶¶ 86, 98, 183, 196). Defendants argue that the maximum allowable damages for these claims at the time they moved for

[4] Plaintiff asks this Court to judicially notice the fact that “ceasing intake of stimulants produces withdrawal” and that certain compounds included in Thesis supplements are “stimulants.” Dkt. 222 at 31–32. The Court agrees with Defendants that these requests “sweep too broadly,” Dkt. 231 at 10, and that the documents cited by Plaintiff do not establish the high degree of certainty required for judicial notice.

[5] Plaintiff also requests injunctive relief under the CPA, asking the Court to enjoin the distribution and sale of Defendants’ products in Washington. Dkt. 45 ¶ 27; Dkt. 222 at 35–37. But as this Court ruled in another CPA case, “[t]o establish standing to seek injunctive relief, a plaintiff must demonstrate ‘a risk of future harm’ that ‘is sufficiently imminent and substantial.’” *Larsen v. PTT, LLC*, No. 3:18-CV-05275-TMC, 2024 WL 5088994, at *8 (W.D. Wash. Dec. 12, 2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021)). Like the class representative in *Larsen*, Plaintiff has stopped using the products at issue and has not signaled any intention to use them ever again. *Id*. Injunctive relief is therefore unavailable.

summary judgment would be $12,708.78 based on the $632 Plaintiff spent on Defendants' products. *Id.* (citing Dkt. 129 at 4, 10–15; Dkt. 190-26 at 6, 8). They then present evidence that they provided Plaintiff with an unconditional tender of $13,000 on January 20, 2026. Dkt. 207-11 at 2. They also present persuasive authority holding that such an unconditional tender moots Plaintiff's remaining claims so long as it meets or exceeds the maximum amount she could recover. Dkt. 207 at 23–24 (citing *Ballin v. Russ Bassett Corp.*, No. 17-CV-3981 PSG, 2017 WL 10527368, at *2–3 (C.D. Cal. Dec. 6, 2017)).

Plaintiff responds that Defendants' calculation "rests entirely on the premise that LeDoux's only possible remaining damages are the price she paid to purchase Defendants' products." Dkt. 222 at 37 (citing Dkt. 207 at 24). But because the Court has granted summary judgment on Plaintiff's claims for medical damages and injunctive relief, *see supra* Section IV.C.1, damages based on the purchase price *are* the only type of relief for the Court to address. Although Plaintiff argues that her evidence supports damages far exceeding the tender, Dkt. 222 at 38–39, the damages she identifies relate to "the emotional impacts tied to her unwitting ingestion of unapproved drugs and NDIs" and "the impacts to her of learning of the dangerous NDIs." *Id.* at 38. As discussed above, the record contains no evidence from which a reasonable jury could find that Defendants caused these harms.

The Court therefore finds that Defendants' unconditional tender of $13,000 moots the remaining claims based on the purchase price Plaintiff paid for Defendants' supplements.

## V. CONCLUSION

The Court GRANTS Defendants' *Daubert* motions. Dkts. 206, 208.

The Court GRANTS Defendants' motion for summary judgment. Dkt. 207. Plaintiff's remaining claims are DISMISSED WITH PREJUDICE.

Dated this 18th day of August, 2026.

Tiffany M. Cartwright
United States District Judge